```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                    Case No. 08-10017-CR-KING
 3
   UNITED STATES OF AMERICA,      )
 4                                )
          GOVERNMENT,             )
 5                                )
          -v-                     )
 6                                )
   ALEXIS DE LA CRUZ SUAREZ,      )
 7                                )
          DEFENDANT.              )   Key West, Florida
 8                                )   July 23, 2009
   _____)
 9

10      TRANSCRIPT OF CLOSING ARGUMENTS, JURY CHARGE, RULE 29

11       AND JURY VERDICT, TAKEN AT THE JURY TRIAL PROCEEDINGS

12           BEFORE THE HONORABLE JAMES LAWRENCE KING

13                UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT        Adam Schwartz, AUSA, and
                               Sivashree Sundaram
17                             99 Northeast 4th Street,
                               Miami, FL 33132
18

19   FOR THE DEFENDANT         Stewart G. Abrams, AFPD
                               150 West Flagler Street,
20                             Miami, FL 33130

21

     Reporter                  Stephen W. Franklin, RMR, CRR, CPE
22   (561)514-3768             Official Court Reporter
                               701 Clematis Street, Suite 417
23                             West Palm Beach, Florida  33401

24

25
```

1        (Call to the order of the Court.)

2             THE COURT:  The jury's coming in.

3        (The jury enters the courtroom, after which the following

4   proceedings were had:)

5             THE COURT:  Thank you.  Be seated, ladies and

6   gentlemen.

7             The parties, the lawyers are now going to speak to

8   you in their closing argument.  You will hear me say later on

9   in the instructions on the law that what the lawyers say is

10  not evidence or binding upon you.  It's their analysis of the

11  case and the evidence as they see it.  It's intended to be

12  helpful to you, and I'm sure that it will be.

13            Mr. Schwartz.

14            MR. SCHWARTZ:  May it please the Court, Counsel.

15            Ladies and gentlemen, this, believe it or not, is a

16  simple case.  I know the last three days now, and the fourth

17  day of trial, you heard from GPS experts, you've seen charts,

18  you've seen videotapes, you've heard live testimony, you've

19  heard all these things, but after these three days what do we

20  know?

21            We know on March 12th, 2008, the Defendant was on a

22  boat in the ocean with aliens heading northbound towards the

23  United States.  We know that the Defendant had his family

24  members and 14 other Cuban nationals aboard that boat, and he

25  was helping them come to the United States.  That's what the

1    Defendant is charged with doing, and that's exactly what he

2    did.

3            There wasn't any rescue.  The Defendant wasn't taking

4    these people back to Cuba or looking for a U.S. Coast Guard to

5    hand them over.  That doesn't make any sense.  He was

6    operating under cover of darkness at night without any running

7    lights, and he was helping these people come to the United

8    States.

9            So what did we hear over the last three days of

10   trial?

11           Well, we know on March 12th, 2008, the Defendant went

12   down to Cuba and to a beach in Matanzas.  At that time, his

13   father, his uncle, his sister-in-law and his niece boarded

14   that boat with 14 other Cuban nationals, and they headed out

15   towards the United States.  And while they were in Cuban

16   territorial waters, they're spotted by the Cuban Coast Guard.

17           Now, the Defendant's vessel, which is an

18   American-flagged go-fast vessel, that we learned that these

19   go-fast vessels are designed for speed and for smuggling, was

20   being chased.  The Defendant was in a fast boat, and he beat

21   the Cuban Coast Guard outside of the Cuban territorial waters.

22   Now, why didn't the Cuban Coast Guard keep following them?

23   Well, you think the Cuban Coast Guard's going to stop and

24   interdict an American-flagged ship in international waters?  I

25   don't think so.

```
 1              So they get out into international waters and they
 2     keep heading towards the United States, and at some point one
 3     of the engines on his go-fast boat breaks down, goes bad.  So
 4     he waits until the cover of night to make his final approach
 5     to the United States.  We know he's heading northbound around
 6     9:00 o'clock directly to South Florida, but he doesn't make it
 7     there, because you heard the U.S. Coast Guard Cutter
 8     Chandeleur was operating in darkness, pulled up behind it, put
 9     on a spotlight and illuminated their law enforcement lights,
10     hailed it to stop, don't go, "stop" in English and Spanish on
11     the radio and also on the loud speaker.
12              And you heard from the Coast Guard, and you saw in
13     the video initially the vessel didn't stop.  The Defendant had
14     a little bit of familiarity in doing this.  He had had a
15     chase, a run-in with the same exact Coast Guard vessel a year
16     before when he had 34 migrants aboard his boat, and he knew
17     pretty quickly that on one engine he couldn't outrun this
18     cutter, so he stops.
19              And you saw the video.  They stopped, they slowed
20     down, the Coast Guard cutter goes around, and we heard that
21     the Coast Guard Cutter Chandeleur launched a boarding team.
22     They board the go-fast vessel.  First thing you notice, this
23     go-fast vessel was outfitted for smuggling.  It had plenty of
24     canned food, plenty of bottled water.  It was meant to feed
25     and take care of a large number of people for a pretty
```

1    decently long journey.  Had a little cuddy cabin to hide

2    people up in the front, as we heard.  This was outfitted for

3    alien smuggling.

4           And then you heard from Ricardo Padilla.  He asked

5    the Defendant the standard boarding question, the purpose of

6    your trip, your destination.  Before the Defendant could think

7    of a better story, he said, "I left Black Point Marina, left

8    Miami, headed down to Cuba, picked up my family, and I was

9    taking them to the United States."  That's what this case is

10   about, ladies and gentlemen.

11          The Judge already informed you at the beginning of

12   jury selection about what the charges are in this case.  The

13   Defendant is charged with encouraging or inducing aliens to

14   come to, to enter or reside in the United States, with

15   knowledge and reckless disregard of the fact that they were,

16   in fact, aliens.

17          Now, I want to talk to you really briefly about a few

18   legal principles.  The first principle is direct and

19   circumstantial evidence.  There's two types of evidence.

20   What's direct evidence?

21          Well, we heard from lieutenant Hoflich, our first

22   witness.  He explained to you exactly what he saw.  He saw

23   that vessel heading northbound.  He saw the vessel didn't

24   stop, and it was hailed multiple times.  That's eyewitness

25   testimony.  That's the direct evidence in this case.

1            But there's also something under the law referred to

2    as circumstantial evidence.  The best way to explain it to you

3    is it's nighttime, you look out your window before you go to

4    bed, dry as can be.  Not a raincloud in sight.  You don't have

5    a sprinkler system, your neighbors don't have a sprinkler

6    system.  You go to sleep, you wake up the next morning,

7    there's puddles all over your driveway.  You didn't see it

8    raining, but based on all these other facts you can deduce it

9    was raining last night.

10            Now, the law makes absolutely no distinction between

11   the direct evidence and circumstantial evidence.  Noticing the

12   puddles, knowing that's the only way the water could have

13   appeared.

14            Now, let's talk about the other legal principle.

15   Now, there's a burden of proof in this case, and it rests

16   solely on our shoulders, on the United States' shoulders.  And

17   it's a burden we embrace.  And we have the burden to prove to

18   you beyond a reasonable doubt each of the counts, and those

19   counts essentially are each of those people who were aboard

20   that vessel on March 12th, 2008.  It's a burden we embrace.

21            But what is reasonable doubt?  It's not some complex

22   mathematical formula.  It's not beyond any and all possible

23   shadow of a doubt.  No, it's the same legal standard that

24   juries have been using to convict defendants in this country

25   for the last 200 years.

1          The judge is going to specifically instruct you and

2     explain to you that it's -- I want to get this right.  It's a

3     real doubt based upon reason and common sense, after careful

4     and impartial consideration of all of the evidence in this

5     case.  It's a proof of such a convincing character that you

6     would be willing to rely and act upon it in the most important

7     of your own affairs.

8          So what does that mean?  Well, it means using common

9     sense, reasonableness, your knowledge of the ways of the world

10    and how things work in coming up and analyzing the evidence,

11    that's what it is.  That's what you're going to do when you go

12    back there and deliberate.

13         Now, I want to take a moment and go through with you

14    the evidence and show you how we've met that burden and proved

15    our case beyond a reasonable doubt.

16         Now, each one of these charges, these counts that are

17    listed on this indictment that you'll get when you go back to

18    the jury room, is a separate charge, separate crime.  It's all

19    the same crime, it just applies to each of the different

20    aliens listed in the indictment.

21         Now, in each charge there's three things we need to

22    prove beyond a reasonable doubt.  In legalese they're called

23    elements.  So I want to go through each element with you and

24    explain how we've met our burden with respect to each of those

25    elements.

1            Now, the first element that the Judge -- the Judge is
2    going to instruct you on what these elements are, and you'll
3    have that in the jury room.  But of the first element is that
4    the Defendant knowingly encouraged or induced the persons
5    listed in the indictment to come to or enter or reside in the
6    United States in violation of the law.
7            So what does "encouraged" and "induced" mean?  Well,
8    the Judge is going to instruct you that "encourage" means to
9    help, to move forward.  "Induced" means to bring on or about,
10   to affect, to cause.  That's exactly what the Defendant did on
11   March 12th, 2008.  He helped, he moved forward, he caused
12   those migrants to come to the United States.  He was helping
13   them.
14           How do we know that?  Well, let's start with
15   lieutenant Hoflich.  He told you that he saw a radar contact
16   heading northbound towards the United States, pulled up
17   along -- pulled up behind it, saw that it was running without
18   any running lights and heading northbound.  And you saw the
19   video, as well, and you see the only way that you could
20   actually see this picture, you can see the boat, is because
21   that's the U.S. Coast Guard spotlight on it.  The Defendant
22   was heading towards the United States.  He wasn't circling
23   around looking for people.  You saw it in the video, the
24   initial parts of the video.  You saw it was zooming towards
25   the United States.

1          You only saw a flew clips.  The full video is five or

2     six minutes, it's a lot of fumbling, and you'll be able to

3     look at the video when you go back there and deliberate.

4          So what else do we know?  Well, we heard from two of

5     the passengers aboard that go-fast vessel.  We heard from

6     Diana Azcui Fabelo and Ariacna Marrero Leon.  I'm murdering

7     their names, but bear with me.  And they told you they boarded

8     a white vessel, modern vessel with two engines in the early

9     morning of March 12th.  They're on that boat and their

10    destination was the United States.

11         And you also heard that the vessel was outfitted for

12    alien smuggling.  It was outfitted to hold a number of

13    passengers for a long journey.  It had plenty of bottles of

14    water, it had plenty of canned food.  You heard that from

15    Ricardo Padilla, who boarded that vessel that evening.  And

16    you also heard, ladies and gentlemen, the Defendant's own

17    words that evening.  He told the U.S. Coast Guard, "I went

18    down to Cuba to pick up my family to take them to the United

19    States."  That's what he was doing.

20         Well, what do we also know?  We know that the

21    Defendant had the intention of taking these people to the

22    United States.  How else do we know that?  Well, you heard

23    that back in February of 2007, the Defendant did the exact

24    same thing.  That time he had 34 Cuban migrants aboard his

25    go-fast vessel.  He was heading up towards the United States.

1          MR. ABRAMS:  Objection, Your Honor.  Reserve a

2    motion.

3          THE COURT:  Overruled.  Go ahead.

4          MR. SCHWARTZ:  What does that show?  It shows the

5    Defendant has the knowledge, the know-how, the experience to

6    be able to conduct this activity.  He knew how to get down to

7    Cuba.  And it shows his intention.  It shows his intent.

8          Now, that's the first element.

9          Now, the second element is that each of those people

10   listed in the indictment, each one are, in fact, aliens.  And

11   what's an alien?  It's someone who's not a national of the

12   United States, not a citizen, doesn't have permission to come

13   to or enter the United States.

14         How do we know that?  Well, you heard from either --

15   either in the video depositions, here live on the stand, that

16   all these -- that they were Cuban nationals.  They didn't have

17   visas to come to the United States.  You heard that once they

18   were interdicted, the U.S. Coast Guard sent them back to Cuba.

19   U.S. nationals aren't sent back to Cuba if they're caught or

20   stopped on the high seas.

21         And what else do we know?  We also have, if you can

22   put up on the screen, 12 of the individuals who were

23   interdicted that night had Cuban identification cards.  Got

24   Lazaro Medina over there.  We saw him on the video.  We saw

25   Diana Azcui Fabelo testify earlier this week, as well.  As

1   well as Yandri, that individual that testified yesterday.

2   We'll have some issue about the actual spelling of his name.

3   He's not too sure of his own spelling, but we'll get to that

4   in a minute.  But it's pretty clear these people are aliens.

5          So the last element.  That last element is the

6   Defendant knew or in reckless disregard of the fact that such

7   persons coming to or entering into the United States would be

8   in violation of the law.  How do we know that he knew that

9   they were aliens, that he knew what he was doing was in

10  violation of the law?

11         Well, number one, he was running without any

12  operational lights in an overcrowded vessel in the middle of

13  the night, 9:00 o'clock at night.  Why?  Because he knew what

14  he was doing was illegal, and he knew that if he was caught by

15  the Coast Guard he was going to get in trouble.

16         And you saw in the first parts of that video before

17  the boarding party could get aboard the vessel, while he was

18  still heading out away from the Coast Guard cutter, he was on

19  a satellite phone.  No satellite phone was recovered from that

20  vessel.  He threw that satellite phone over, ladies and

21  gentlemen, because he knew from his previous experience that

22  satellite phones have evidence.  It would show evidence of his

23  guilt.  So he was trying to cover up his tracks as much as

24  possible.

25         MR. ABRAMS:  Excuse me, Your Honor.  I'm sorry.  I

Page 12

1    have to object, 404(b).

2              THE COURT:  Overruled.  Go ahead.

3              MR. SCHWARTZ:  The second way we -- another way we

4    know that he was doing -- that he knew he was in violation of

5    the law:  Well, ladies and gentlemen, he didn't stop right

6    away.

7              And, also, he knew that his family members didn't

8    have permission to come to the United States.  He knew his

9    father, his sister-in-law, uncle, niece didn't have visas.  He

10   went down to Cuba and picked them up.

11             And one other thing.  I know we went through a lot

12   with this GPS expert and this GPS unit that was found aboard

13   the vessel, and he talked about -- Will Abaunza.  Remember

14   him?  He talked about tracking data, and that's sort of the

15   breadcrumbs.  Basically when the GPS unit's on and it has

16   connectivity, it records exactly where it is and how long it's

17   turned on.  And we know that that unit was on the evening of

18   March 11th, as it -- as he navigated through the Miami River,

19   down through Biscayne Bay, exited out through Black Point

20   Marina.  Then it was turned off.

21             Well, he knew how to navigate down to Cuba.  He had

22   experience in that, so he left it off.  Why?  Why did he not

23   turn it back on?  Because he knew that that includes more

24   evidence, evidence of his crime.  So he was trying to limit

25   the use of that GPS unit as much as possible, because the next

Page 13

1    time he turns on that unit --

2           Can we go to the GPS?

3           The tracking data shows that the unit, next time it

4    was turned on was right off the coast of Cuba at 10:20 the

5    following morning.  He wanted to make sure he was in the right

6    position so he could just head straight north and hit South

7    Florida, and then he turned it back off again.  If he wasn't

8    doing anything wrong, if he didn't know he was smuggling in

9    aliens, he would have had this GPS unit on the whole time.  He

10   wouldn't feel the need to cover his tracks.

11          Now, we've talked about the facts.  Let's talk about

12   some fiction.

13          You heard from the Defense a story.  You heard from

14   the video depositions, from the witnesses here, that -- well,

15   it depends on if you go by what they say in their letters and

16   what they say on the depositions.  But they either left on

17   March 7th in the letters, March 11th on the videos, and they

18   got on this raft.  They couldn't describe it too well, but

19   everybody knew it was made out of zinc, wood and poly-foam.

20   And they were going along.  They had no idea where they were

21   going.  They had really no navigational equipment.  The father

22   said that some strange man handed them a GPS, but he works in

23   the field, so he didn't even know how to turn it on, so he

24   couldn't even use that.

25          So they're heading out and they took on water after

Page 14

1    maybe one night or two nights on the sea.  It depends on which

2    person you believe, whatever they say.  And then they were

3    stranded on some island.  They had no idea where they were,

4    but they say now that they were on the Cay Sal Bank, 30 miles,

5    as you heard, off the coast of Cuba.  And one or two of the

6    migrants had regular cellphones, not fancy satellite phones,

7    but regular cellphones, and miraculously they're able to

8    contact Cuba and their family and tell them exactly where they

9    were, even though they had no idea where they were, even

10   though we know from the U.S. Coast Guard that U.S. cellphones

11   don't even work 10 miles off the coast of the United States,

12   so a Cuban cellphone is going to work 30 miles off the coast

13   of Cuba?

14           Well, suspending disbelief and keep going with their

15   story, the call's made to the family members in Cuba, and then

16   a few hours later the Defendant arrived.  He knows exactly

17   where they are, just a couple hours later.  That's the uncle,

18   Lazaro Medina's the family friend, and the father's story.

19           The aunt as -- sorry, the sister-in-law says they

20   might have been there for five or six days in the island.

21   Little interesting.  She can't remember if she spent one night

22   on the island or not.  She said it could have even been months

23   if you look at the depo transcript.

24           So he appears, and then he hasn't seen his father,

25   his sister-in-law, his uncle, his niece in a long time, and

1    what's the first thing he says?  Not "so glad you're okay, I
2    missed you," it's, "I cannot take you to the United States, I
3    must turn you over to the authorities."
4            Come on, ladies and gentlemen.  That's a story.
5    That's not reasonable.  That defies common sense.
6            So how did this all come about?
7            Well, you're going to see in Government exhibit 9
8    that a bunch of letters were sent to the defense attorney.
9    And we heard from some of the depositions that these letters,
10   they were arranged by the Defendant's family.  They were
11   arranged by his brother, Alfredo, who lives in the United
12   States, and by his family members down in Cuba.
13           So what do we know about these letters?  Well, first
14   of all we know that they're nearly identical.  If you -- I
15   want you to take a look at Government exhibit 9, and you'll
16   see they all say, I think except for one, "we left on
17   March 7th to the United States."  Both then say immediately
18   Alexis De La Cruz Suarez, had no indication, "we were going to
19   the United States."  Then it says, "we were stranded, he saved
20   us.  First thing he told us, that he could not take us to the
21   United States."  They're cookie cutter.  They weren't --
22           What do we know about who wrote these letters?  Well,
23   we know that two of the people whose names are on the letters
24   didn't even write them.  You heard from Diana Azcui Fabelo
25   that that letter that was written in her name that was filed

1   by the Defense wasn't her.  They misspelled her name.  They

2   put that it was dated April 7th, but she was already in the

3   United States at that time.

4        You also heard from one of the Defendant's own

5   witnesses, Lazaro Medina Medina, who said, "I didn't write

6   that letter" when he was shown that letter down in Cuba.  He

7   thinks it may have been his brother, because his brother asked

8   him to write that letter because his brother was speaking to

9   the Defendant's family, and they wanted him to write a letter.

10  Couldn't even write that letter.  So we know that two of those

11  letters aren't even written by the people who they purport to

12  be.

13       And we also heard from Yandri yesterday.  He spelled

14  his name one way when he was asked to spell it for the court

15  reporter.  On the letter it's spelled a different way.  So

16  either he doesn't know how to spell his name or he didn't

17  write that letter.

18       So we know that pretty much these letters were

19  organized and put together by the Defendant's family.  The

20  Defendant realized he was in trouble, and who did he turn to?

21  He turned to his family and his friends to help him out.

22       Listen, I don't blame their family.  They're doing

23  what a family is supposed to do, protect each other.  But

24  that's -- but that doesn't give the Defendant a right to come

25  up here and put on a bogus story.  He has no burden of proof

1    in this case.

2           So let's talk about a little bit what they said.

3    Well, you had the father.  In the letter, he said he was on

4    this stranded island for days, but when he was deposed he said

5    it was just a few hours.  They got to the island in the

6    morning, and it was a few hours.  The phone call was made, and

7    a few hours later the Defendant showed up.  He also said that

8    the boat was stopped even before the U.S. Coast Guard came,

9    and they had their lights on and everything.  We know that's

10   not the case.

11          The uncle, Reniel.  Well, he said they left five days

12   before they were quote-unquote saved, in the letter.  But

13   based on his testimony, they were only there for -- on the

14   ocean for one night and on the island just a few hours.

15          And then you got the sister-in-law.  Well, in her

16   letter, she said they were on a rustic boat for I think around

17   six days.  That's a long time to be on a rustic boat.  Then in

18   her depo she said she was maybe on the -- on that rustic

19   vessel for one night.  But then she said in her deposition she

20   was on the Cay Sal for I think many days.  Everyone else said

21   it wasn't even a full night.  So they couldn't get their story

22   straight when they had to -- when they were alone and being

23   asked questions by us.

24          Then you got Lazaro Medina Medina.  Well, he said

25   they were together seven days before being caught by the Coast

Page 18

1    Guard, if you look at his deposition.  And he didn't even

2    write the letter.

3           Then you got Yandri over here, the family friend who

4    refused to give a deposition back in Cuba.  He didn't know his

5    U.S. visa was already issued.  He couldn't explain why.  He

6    was asked to write a letter by the family.

7           Now, the Judge is going to instruct you that when

8    you're evaluating testimony in this trial, you're supposed to

9    make credibility determination, whether they were live in

10   person here or you watched them on the video screen.  And

11   there's a certain number of questions the Judge is going to

12   tell you about that you should ask yourself when determining

13   whether someone's lying or telling the truth.  Well, let's go

14   through some of those questions.

15          The first question is:  Did the witness impress you

16   as one who was telling the truth?

17          Did the witness have any particular reason not to

18   tell the truth?

19          Did the witness have a personal interest in the

20   outcome of this case?

21          Well, I submit to you, ladies and gentlemen, the

22   Defendant's family had a reason to lie, and they have a huge

23   interest in the outcome of this case.  They don't want their

24   son, their nephew, their brother-in-law to get in trouble, nor

25   did Yandri, a friend who knew the Defendant from his days back

1    in Cuba, knew his family.  They want to make sure he -- they

2    want to help him out.  They care about him.  They have a huge

3    interest in the outcome of this case.

4         And then also another question the Judge is going to

5    ask you:  Well, does their witnesses' testimony differ from

6    other testimony and other evidence?

7         Well, absolutely.  Well, let's start first with the

8    other people we heard were aboard that boat, Diana and

9    Ariacna.  No, both women told us they were never stranded on

10   any island.  They were onboard a boat, a white boat, who had a

11   cabin in front, two engines.  They left from a beach in

12   Matanzas.  They headed towards the United States before they

13   were stopped by the U.S. Coast Guard.  They never got off the

14   boat.  There was no stranding on an island.  There wasn't a

15   rustic craft.

16        Now, what is their interest in this case?  They don't

17   even know the Defendant.  They came here because they were

18   subpoenaed, and they told you what happened.  They didn't want

19   to be here.  They don't know the Defendant from Adam, from me.

20   They told you what they knew.  They had no motivation for

21   lying.

22        And we know for a fact that that boat wasn't circling

23   around looking for the U.S. Coast Guard, it was heading north.

24   It was heading north towards the United States.  You saw the

25   video.  It was running without any operational lights.  If

1    you're looking for the Coast Guard, wouldn't you leave lights

2    on?  Wouldn't you make yourself as visual, as visible as

3    possible?  There were no distress messages.

4         You heard from lieutenant Hoflich, you heard from

5    Mark Szoboszlay and Ricardo Padilla.  They're monitoring all

6    the channels.  No emergency message came through.  The

7    Defendant had a satellite phone.  We saw that in the video.

8    He didn't make any phone calls to the Coast Guard to say,

9    "pick up my family, I'm looking for the Coast Guard."  No.

10   Why?  Because he was heading towards the United States.  He

11   was smuggling these people into the United States.

12        The Defendant's own words.  Before he could sit down

13   and figure out a good story, a good excuse, before he could

14   recruit all his family members, he told the Coast Guard, "hey,

15   I went down to Cuba, picked up my family members and was

16   taking them to the United States."  That's what happened.

17        And also let's look at the GPS unit.  That GPS unit

18   shows the Defendant's boat at 10:20 in the morning.  The

19   migrants said that they were barely on his vessel, and they

20   were -- you know, it was nighttime when they got aboard it, it

21   was evening already.  Well, the Defendant was off the coast of

22   Cuba, south of the Cay Sal Bank at 10:20 that morning, before,

23   according to their testimony, they were even stranded on that

24   Cay Sal.  He was down in Cuba, ladies and gentlemen, and he

25   was heading northbound towards the United States.

Page 21

1          And in that GPS unit, if you recall, there were saved

2     routes.  The Defendant didn't need to have the unit on for

3     those routes because he knew what he was doing.  But the route

4     showed that the destination trip to Matanzas, Cuba, the place

5     where he picked up those 18 aliens.

6          Ladies and gentlemen, this case is simple.  The

7     Defendant was on the boat on the high seas with aliens heading

8     towards the United States.  He was helping those people come

9     to the United States.  That's what the Defendant is charged

10    with, that's what the Defendant did.  That's what all the

11    evidence proves beyond a reasonable doubt.

12         There's only one verdict consistent with all the

13    evidence in this case.  It's a verdict of guilty as to all

14    counts.

15         Thank you.

16         THE COURT:  All right.  Mr. Abrams for the Defense.

17         MR. ABRAMS:  Yes, sir.

18         May we have just one moment, Judge?

19         THE COURT:  Yes.

20      (Brief pause in proceedings.)

21         MR. ABRAMS:  May it please the Court?

22         THE COURT:  Yes, sir.

23         MR. ABRAMS:  Counsel, counsel, agent, Mr. De La Cruz.

24         Ladies and gentlemen, first I want to thank you for

25    your time and your attention to this case.  I think I agree

Page 22

1    with Mr. Schwartz.  It's not a very complicated case.  It took

2    us a number of days to get all the evidence in.  I am amazed

3    that he can remember the names.  I had to bring up a list.  I

4    can't remember the names.

5           But I stand before you again, as I did a few days

6    ago, with the microphone, and I said every time I stand before

7    you I feel like I should be singing or something, so I wore my

8    Lounge Lizard tie.  And I am reminded of a song with respect

9    to some of the evidence that you'll hear in this case.  I'm

10   not even going to attempt to try and sing it.  Again, forget

11   it.  You won't listen to anything else I have to say.  But

12   it's a Phil Collins song which seems to fit pretty well with

13   some of the facts of this case.  I'll tell you right now, you

14   know the song where Phil Collins says, "I can say day, you'd

15   say night.  Tell me it's black when I tell you it's white?"

16   And I don't remember the rest of the words, but that fits a

17   lot of the testimony that you heard during the course of this

18   trial from the Government witnesses.  And I'll go through that

19   with you a little bit as I go on.

20           Now, I can see some of the names.

21           I just want to go back a little bit and also talk to

22   you and make some comments about the evidence, what you've

23   heard, what you haven't heard with respect to this case.  And

24   some of this I'll take in order, and some of this -- and I've

25   asked to put some of the stuff on the screen, because if I was

1    to take that blackboard and write, you wouldn't be able to

2    read a thing that I was going to write there.  So hopefully

3    we're going to be able to illustrate some of these points for

4    you.

5          But just going back on what you heard about this

6    case, I agree it's not difficult, it's not very complex, but

7    the question is there is no issue whether or not Alexis De La

8    Cruz Suarez was out on the water on a boat on March 12th,

9    2008.  There is no issue.  He was there.  Were there people on

10   his boat?  Yes, there were people on his boat.  The whole

11   issue with respect to his -- this case is why was he there.

12   Was this a rescue?  Was this alien smuggling?  This case has

13   nothing to do with 2007, and anything you heard with respect

14   to him in 2007 was 2007 and has to do with the issue of his

15   intent with respect to this case.  And I'll talk about that a

16   little bit more in a moment, as well.

17         But let's go back to what the testimony was that you

18   heard with respect to this case.

19         Commander Hoflich, the captain of the Chandeleur,

20   with the radar, with two sets of radar, one which he said he

21   relies on for six miles, one which he relies on for purposes

22   of 18 miles, but radar contacts which he can pick up from a

23   hundred miles away.  What is the first radar contact that the

24   Chandeleur had with Mr. De La Cruz's vessel?  It was 8:00 p.m.

25   on March 12, 2008.  And where was that vessel located?  It was

Page 24

1    located one hour north of the Cay Sal Bank.  The vessel was

2    traveling at approximately 20 miles an hour.

3           And let me ask you something right off the bat.  Even

4    assuming Alexis was having problems with his boat, you have --

5    and, by the way, you have the video.  You have the video.

6    It's not very long when the Chandeleur stopped Mr. De La

7    Cruz's boat.  And you'll see that when they lit it up, it was

8    moving.  You don't know how it was moving.  Look how fast it

9    was going.  I mean, you can't tell a certain number of miles

10   per hour, but you can judge.  Look at this and see how fast

11   this vessel was going.

12          This vessel's going at 20 miles an hour, and Mr. De

13   La Cruz picked these people up at 8:00 o'clock in the morning

14   from Matanzas?  If that was 8:00 o'clock in the morning and he

15   was stopped at 9:00 o'clock at night, even at 20 miles an hour

16   how far is he gonna go?  He's gonna go well over 200 miles in

17   his vessel on one engine.  How far is it between here and

18   Cuba?  How many round trips could he make, or at least one

19   round trip during that time?

20          All right.  But the first time they pick him up is

21   north of the Cay Sal Bank, not in Matanzas, not just off the

22   coast of Cuba, but in Bahamian waters north of the Cay Sal

23   Bank.

24          The GPS.  What do we know about the GPS?  We know

25   that there were four track points on the GPS on March 11,

1   2008, showing that the GPS, the GPS, not Mr. De La Cruz

2   Suarez, not Mr. De La Cruz's boat, but the GPS unit itself was

3   in Miami and traveled down the Miami River and then south on

4   Biscayne Bay.

5           We know that that GPS the next day was turned on and

6   off twice, that there were four points on that GPS.  We know

7   that on March 12, 2008, there was one breadcrumb, and that

8   breadcrumb was off the coast of Cuba, as well as off the coast

9   of this Cay Sal Bank in Elbow Cay.  Which way was that vessel

10  going?  We have one breadcrumb.  We know that there were

11  waypoints that were programmed into the GPS.  Who programmed

12  those waypoints into the GPS?  There was a route programmed

13  into the GPS to Matanzas.  Do we have any breadcrumbs showing

14  that that vessel went along any route into Matanzas?  We

15  don't.

16          Was there evidence of erasure from the GPS?  We don't

17  know.  So the fact that you've got a GPS, that's what you got,

18  you got a GPS.  And if there was something to hide here, and

19  as the Government suggests, Mr. De La Cruz Suarez tossed a

20  telephone over the side of the boat, nice little GPS, it's

21  gone, didn't happen.

22          So what else do we got?  Let's talk about one of the

23  other Government witnesses.  Let's talk about Ricardo Padilla.

24  Mr. Padilla testified he did 24 boardings in two months, 24

25  boardings in two months.  This is 15 months ago -- 16 months

1    ago, excuse me.  Twenty-four boardings.  How many boardings

2    has he done since that time?  Mr. Padilla tells you he can't

3    identify Alexis, but what does he remember about Alexis?

4          Alexis has -- remember he sat there?  Remember he sat

5    there, he's look around, he's looking around the courtroom,

6    and he's moving up and down and all around, and he says, "I

7    don't -- I don't see him, but I remember he had a shaved

8    head."  There's the shaved head.  That's what he remembers,

9    this Defense exhibit B.  This is the man with the shaved head,

10   and this is the person, officer Padilla, who says, "oh, I

11   remember him", despite all the boardings, can't identify him

12   in the courtroom, and the man who can't identify him in the

13   courtroom attributes a statement to Alexis.

14          Did Alexis tell officer Padilla, "I went to Cuba to

15   pick up my family," or "I went to pick up my family from

16   Cuba," or some other derivation of those words?  How

17   different -- the reason I put that up, how different just

18   those two little phrases are?  First one says he went to Cuba.

19   The other thing says, the second one says he picked up people

20   who were -- who were from Cuba.  Very big difference, very big

21   difference.  Second one doesn't mean that he was there.

22          The first one you could imply that he was.  Second

23   one he wasn't.  The man who can't identify him, who gave an

24   inaccurate description, who makes 24 boardings in two months,

25   is the person who the Government asks you to rely on for a

Page 27

1    statement from him that he went to Cuba to pick up his family.

2           What else does the Government got?  The women, the

3    women who don't remember stuff.  Let's talk about the other

4    Government witnesses.  Ariacna Marrero Leon and Diana Azcui

5    Fabelo.

6           Ariacna Marrero Leon tells you she left Cuba in a

7    boat.  Diana Azcui Fabelo tells you -- the first thing she

8    said --

9           MS. SUNDARAM:  Objection, Your Honor.  This is facts

10   not in evidence.  This is mischaracterizing the witnesses'

11   testimony, Your Honor.

12          THE COURT:  The jury will have to make a

13   determination what those witnesses said, and your memory is

14   what controls.

15          Go ahead.

16          MR. ABRAMS:  Thank you, Your Honor.

17          The first thing that Diana Azcui Fabelo said was --

18   and you, of course, will discuss the case amongst yourselves,

19   and what you recall is what you recall.  She later said boat;

20   she first said raft.

21          Ms. Marrero Leon said the Cuban border guard chased

22   the go-fast boat for 30 minutes.  Diana Azcui Fabelo said, "I

23   saw the Cuban border guard boat," but there was nothing about

24   a chase.

25          Now, interestingly, this is Government exhibit 5-E.

1    According to Ms. Marrero, she spent the entire boat trip in

2    the cabin.  Folks, look where the cabin is.  Here's the cabin.

3    You're going to have the picture back with you in the jury

4    room to check out and look at all you want.  I asked her, you

5    might remember my asking her, "Ms. Marrero Leon, how did you

6    see the Cuban border guard, and particularly the insignia on

7    their uniforms, if you were in the cabin?"  And she said, "I

8    could see them off the back of the boat.

9              All right.  Well, that's magical.  To see off the

10   back of this boat, not only do you have to see through the

11   center console, anyone standing behind that center console,

12   over the engines, and also were the number of people that were

13   on that boat.

14             So I give that to you for what it's worth.  I suggest

15   to you also the cabin is lower than the deck.  Ms. Marrero is

16   not seeing anything off the back of that boat.

17             Ms. Marrero told you that the boat was intercepted by

18   the Coast Guard as night came.  Ms. Azcui Fabelo told you they

19   were intercepted during the day.

20             And one of the other things I'll point out in Ms. --

21   I can't see.  Remember Ms. Azcui's testimony?  Said "where'd

22   you leave Cuba from, or where'd you go?  I don't know.  Who

23   told you about this trip?  I don't remember.  Well, how'd you

24   get to where you were going?  I don't remember.  Well, where

25   did you go?  A beach in Matanzas.  Which beach?  I don't know,

1    I'm not from there."

2           First she told you she went alone.  Then she told you

3    she went with other people.  But did you notice everything I

4    asked her?  "I don't know; I don't remember."  Remember, "can

5    you identify the boat you were on?  No.  Can you identify the

6    Defendant?  No."  Everything, anything, anything, anything,

7    anything having to do with the details of what she did, how

8    she found this boat in a town where she doesn't live and is

9    not familiar with, she can't tell you.  Why?  Because there

10   was no trip on that boat from Cuba.

11          Motive?  Government asks what's the motive.  She came

12   to this country illegally twice.  Now the Government's looking

13   at her, and the Government serves her with a subpoena.  She's

14   in a country where she wasn't born and does not have -- did

15   not have legal status.  You ask what's the motive.

16          All right.  Let's talk about Government witnesses

17   versus our witnesses.  From the Government witnesses, you've

18   got a constant flow of "I don't remember."  And what'd you get

19   from the defense witnesses?  Now, the defense witness -- and

20   you've heard, and you've heard and we presented -- you're

21   going to have the letters, and you're going to have the

22   letters to read.  We presented the deposition of Lazaro

23   Medina, who said that he did not write the letter that was

24   attributed to him, and that he's friends with the family of

25   Alexis De La Cruz Suarez.  But remember something which is

Page 30

1   very, very, very important with respect to that, and that's

2   that Lazaro Medina told you that everything that was in that

3   letter is what happened.  Does it make sense that Alexis De La

4   Cruz, who has family members in Cuba, the family members are

5   going to want to help him?  Sure it does.  But even if someone

6   other than Mr. Medina, in this case Mr. Medina's brother, may

7   have written the letter, the fact remains that Mr. Medina

8   Medina appeared for a deposition and told -- and told you,

9   told you through his deposition, that everything that appeared

10  in the letter is, in fact, exactly what happened.

11         Yandri Orihuela Alonso or Alfonso, Yandri did not

12  appear for a deposition in Cuba.  Yandri did appear here.

13  Yandri told you why he didn't appear.  He was concerned about

14  his visa.  He wanted to come to the United States, and he

15  wanted to come to the United States legally, and he didn't

16  want to take a chance on the Cuban government not giving him

17  his visa.

18         Cuba's not like the United States.  He had his fears.

19  He didn't appear.  He appeared here after being in this

20  country for a very short time.  Told you that he wrote the

21  letter.  And most importantly, and what the Government kept

22  trying to cross-examine him on, and question, and question,

23  and question, but he was unflappable, what was in the letter

24  is what happened to the best of his recollection.

25         And what did the witnesses tell you consistently?

Page 31

1    The witnesses told you that they heard about a boat trip,

2    about a raft leaving Cuba, that they were to go to a bus

3    station in Matanzas, where they were to give a code word or a

4    code name, and they were going to be picked up by a truck.

5         And listen to the little details, which are real

6    consistent.  They went for a distance in the truck.  It was a

7    wet night, it was rainy.  The truck got off the main road and

8    onto a dirt road, where it stopped.  They got out of the

9    truck, they had to walk through muck and dirt or mud a

10   distance to where the raft was, and the raft was -- and I can

11   say it now, because it's been several months -- they went to

12   Bacunayagua.  I can say it now.  B-a-c-a -- B-a-c-u -- I can't

13   spell it.  B-a-c-u-n-a-y-a-g-u-a, that's for the court

14   reporter.  And when they reached Bacunayagua, there was the

15   raft.

16        Now, when the Government cross-examined Mr. Yandri

17   Orihuela Alfonso they asked him, "well, you know Alexis'

18   family, right?"  And he said, yeah, he does know some of

19   Alexis -- he had a relationship with Alexis, a casual

20   relationship, but he did know some of the family members.  And

21   they asked, "but you didn't see him on the truck.  You didn't

22   say that he was on the truck?"  And he said, "no."  Now, if

23   he's going to make up a story, "yeah, we all went together."

24   He said no, but he did see them on the raft.

25        Remember the testimony.  And the witnesses were

1    consistent.  When the family members, Alexis' father and his

2    uncle and the -- and the wife of his brother and the little

3    girl went, got to the beach, there was another group of people

4    there.  I suggest to you that Mr. Orihuela was with the other

5    group, and they got together on the raft.  They're consistent

6    with when they left Cuba, they're consistent about the raft

7    taking on water.

8            And one of the little details which was -- which was

9    kind of interesting was when the raft started taking on water

10   and they had to bail out the boat, they bailed the boat with a

11   rubber boot.  How many of the witnesses talked to you talked

12   about the rubber boot?  I mean, if you're going to tell a lie,

13   this is a real fine little detail to be lying about, something

14   that was on the boat, something that was available on the boat

15   to use to bail.  They talked about the rubber boot.  They

16   talked about going to the island with the rocks.

17           Now, if they were going to lie, then they'd say, "we

18   went to Cay Sal."  They didn't say that.  They said, "we went

19   to a rock formation.  We weren't exactly sure what it was."

20   Somebody said later -- and, remember, these people spent 12

21   days together on the Coast Guard cutter, and they were

22   together, and they talked.  All it takes is one to know, "we

23   were on Cay Sal," and at this point they're all going to know

24   they were on Cay Sal.  But that's not what they said in the

25   depositions.  "I didn't know where it was."

1          And some of them got on the phone, there were

2     cellphones, and they were able to make calls.  A couple were

3     able to make calls and reach mainland Cuba from where they

4     were.

5          Well, Mr. Hoflich testified that his U.S. cellphone

6     only works a certain distance offshore, and he didn't know

7     whether or not his cellphone would work in Cuba.  He does not

8     have a Cuban cellphone.  The unrefuted testimony was that the

9     witnesses in this case were able to make phone calls, some of

10    them were, at least, to family members in Cuba, and that his

11    sister-in-law, Alexis' sister-in-law, was able to reach his

12    mother in Cuba.

13         Now, we don't know, of course, the nature of the

14    phone calls from Cuba to mainland United States, but we know

15    that some time after that, Alexis showed up and he took

16    everyone -- what's he supposed to do, just pick up his family

17    and leave the other people there?  No.  He took everyone.  And

18    he was making headway.  And, again, through the video you can

19    see how fast the boat went.

20         Now, Mr. Schwartz talked a lot about Alexis' -- well,

21    let's just say the Judge is going to tell you what you can and

22    cannot use Alexis' prior conviction for.  And there is a prior

23    conviction.  I want to talk to you just about that for very --

24    just very briefly.

25         This case, there's one person on the boat, just one

Page 34

 1    person operating the boat.  The last case there were two

 2    people on the boat.  This case, no Coast Guard chase.  The

 3    other case you heard testimony there was a three-hour chase.

 4    And, again, you've got the video.  You can see what kind of a

 5    chase there was with respect to this case.

 6            Finally, in the other case no family.  This case,

 7    four family members were rescued by Alexis De La Cruz Suarez.

 8    And you've got this in evidence.  This is the judgment.  This

 9    is Government exhibit 15.  Look at it really closely.  The

10    only thing that Alexis De La Cruz Suarez was convicted of was

11    conspiracy.

12            Now, the charge is conspiracy to smuggle aliens, as

13    it says on here.  Look below that.  The other counts -- and

14    there are six of them -- he was found not guilty.  This is

15    only considered with respect to what this man's intent was on

16    March 12th, 2008.  Did he intend to smuggle, did he intend to

17    rescue, and that's it.

18            Ladies and gentlemen, that's it in a nutshell.  The

19    Government makes hay of the fact that Mr. De La Cruz Suarez's

20    witnesses are mostly family members or friends of the family

21    and they got together to tell a story.  I'd suggest to you if

22    that's what this was about, they would have told a much

23    better, a much tighter story with -- with many, many less

24    little insignificant facts.  But the insignificant facts are

25    so, so important in determining whether to believe or not

Page 35

1   believe the statements, because the little facts are

2   consistent.

3            And, again, remember that these depositions happened

4   14 months after the incident.  All right?  So they're not

5   going to be exact.  If this was made up they'd be exact, but

6   they're not.

7            What it's all about, ladies and gentlemen, reasonable

8   doubt.  The burden in this case lies right there.

9   Mr. Schwartz embraces that burden, as he should, because

10  that's what it's about.  This is not about convicting someone,

11  it's about doing justice.  It's about what's right.  If the

12  proof is there, the proof is there.  If the proof isn't, it

13  isn't.

14           And Judge King will read the instruction to you on

15  reasonable doubt.  It's a very high burden.  It's a very high

16  burden for a reason, and it lies right there.

17           Ladies and gentlemen, as I told you in opening, this

18  courtroom, this courthouse has seen many, many cases.  In

19  fact, I don't know if you know, this was the first courthouse

20  in the Southern District of Florida.  Most people think it was

21  Miami, but this was the first one in our district.  Judge King

22  has presided over many, many cases down here, many of the very

23  historic cases in this courtroom.  And this is a great place.

24  This is a really great place.

25           And even though this case isn't among the biggest

Page 36

1    cases our district has seen or with the greatest number of

2    witnesses or facts and evidence, again, and as I told you in

3    opening, this courthouse will never, ever see a case which is

4    more important to Alexis De La Cruz Suarez than this case.

5           For what you've done, for what you will do with

6    respect to your deliberations, I thank you.

7           THE COURT:  All right.  As soon as we have the

8    machine here, the gadgetry straightened out, Ms. Sundaram will

9    give to you the opposing rebuttal.

10          MS. SUNDARAM:  Thank you, Your Honor.

11          Ladies and gentlemen, this isn't Gilligan's Island.

12   Nobody was stranded on a desert island for days.  You don't

13   make cellphones out of coconuts and randomly call and

14   miraculously reach Cuba from the middle of an uninhabited

15   deserted island, and then somehow after that a few hours later

16   someone magically appears in a boat to rescue you.  This isn't

17   Gilligan's Island, ladies and gentlemen.

18          The Defendant, Alexis De La Cruz Suarez, intended to

19   bring those 18 aliens to the United States.  He did not say,

20   "I can't take you to the United States, everyone, I gotta take

21   you to the authorities, I don't want to get in trouble."

22          Reasonable doubt is about common sense, and we'd ask

23   you to use your common sense when looking at the evidence and

24   evaluating the testimony.

25          So let's talk about a few of the things the Defense

1    just talked about, that Mr. Abrams just brought up to you.

2           First of all, he brought up to you about the

3    Government witnesses, the Defendant's witnesses and the

4    different stories you heard.  He talked about officer Ricardo

5    Padilla with the U.S. Coast Guard.  He made hay of the fact

6    that officer Padilla couldn't exactly identify the Defendant

7    in court, that he's done 24 boardings in two months.  But

8    ladies and gentlemen, the Defendant's own family, if you

9    remember from the depositions, couldn't identify the

10   Defendant.  You heard his sister-in-law.  She wasn't sure.  He

11   looked strange, he didn't look right, couldn't identify him.

12   You heard from Yandri Orihuela Alfonso.  He said it seems to

13   be the Defendant who rescued him that day.

14          What's the difference there, ladies and gentlemen?

15   We didn't just have officer Padilla's testimony.  Officer

16   Padilla told you that this defendant said to him, "I went to

17   Cuba to pick up my family, and we headed back to the United

18   States."  That's what happened.  But unlike what Mr. Abrams

19   told you, we're not just relying on that, ladies and

20   gentlemen.  That's not the only evidence in this case.

21          We know that the Defendant was on that vessel on

22   March 12th, 2008.  Mr. Abrams admitted that.  We also know

23   that Mr. Padilla, officer Padilla, on that vessel found this

24   satellite phone case.  Says "sat. phone" right on it, a

25   satellite phone which, unlike a cellphone, does have reception

1   out on the seas.  No satellite phone, though.

2            And as you'll watch in the video or as you already

3   saw, and you heard lieutenant Hoflich and officer Szoboszlay

4   testify, the Defendant was on that satellite phone, ladies and

5   gentlemen.  You can see that in the video.  You can see him on

6   his satellite phone, and yet no satellite phone was found

7   onboard.

8            What else did officer Padilla find?  This GPS unit.

9   The Defendant's not going to have time to toss this overboard.

10  He was on the phone, on the satellite phone.  He had just

11  enough time to toss that overboard.  He left this GPS onboard,

12  though.

13           But you don't just have officer Padilla's testimony

14  about that, you also heard from officer Szoboszlay.  GPS found

15  onboard, satellite phone case found onboard.  And even though

16  he could see the Defendant on that vessel on the satellite

17  phone, none was found onboard.

18           And you know what else wasn't found onboard, ladies

19  and gentlemen?  You know what else wasn't found onboard was

20  that cellphone, that regular cellphone that, according to the

21  Defendant, his family members used to magically call Cuba.

22  There's no cellphone found onboard that vessel, ladies and

23  gentlemen.

24           We also have those Cuban identification documents,

25  those Cuban identification documents that both officer Padilla

Page 39

1    and officer Szoboszlay told you were found onboard that vessel

2    with those aliens.

3          So let's talk about those aliens.  There's a lot of

4    different facts going around.

5          Now, you heard from Diana Azcui Fabelo.  She was

6    onboard that vessel, ladies and gentlemen, and you know that

7    because her Cuban identification document was recovered.  You

8    heard that from two of the officers.

9          Ariacna Marrero Leon.  How do we know she was onboard

10   that vessel?  She was able to identify this man, Government's

11   exhibit 8, Lazaro Medina Medina.  You heard from him in his

12   deposition.  He was another individual onboard.

13         Now, the defense attorney suggested to you that those

14   two witnesses were lying, and he provided you potential

15   motives for those witnesses to lie.  Ladies and gentlemen, if

16   that were true, wouldn't those witnesses have just identified

17   the Defendant and said, "he picked us up from Cuba?"  But they

18   were telling the truth.

19         Now, Mr. Abrams talked to you about all the facts

20   that they couldn't remember, very detailed facts that the

21   Defendant's witnesses could remember.  Ladies and gentlemen,

22   listening to those depositions, listening to Mr. Alfonso on

23   the stand, there were a lot of facts that they couldn't

24   remember.

25         Now, Mr. Abrams talked about how they were very

Page 40

1    detailed, their witnesses.  They could remember specific

2    details, going from the main road to the dirt road, to the

3    bus, to the truck, to the in the middle of the mud, they had a

4    rubber boot onboard.  They could remember all those minute

5    details, yet they couldn't remember if they were on that

6    homemade raft for one day, two days, six days.  They couldn't

7    remember if they were stranded on a deserted island for a few

8    hours, one night, two nights, six nights?  Details, ladies and

9    gentlemen, detailed facts that they could remember and all

10   happened to be consistent, a little too consistent.

11        They all told you how the Defendant's -- if they

12   weren't the Defendant's family themselves, they all spoke to

13   the Defendant's family, and the Defendant's family asked them

14   to write letters.  Now, Mr. Abrams said something.  He said if

15   these were made up they'd be exact.  Ladies and gentlemen,

16   you've heard a lot of talk about these letters, letters that

17   were written and sent to defense counsel and presented as the

18   story that happened, the story.

19        Well, let's look at these letters, because you

20   haven't really seen these letters yet, and you're going to

21   have these when you go back to the jury room to deliberate,

22   but I just want to show you two of the letters.

23        Can y'all read that?  It's a little small, I know.

24        All right.  Now, let's take a look at these two

25   letters, ladies and gentlemen, and I'll read some of this out

Page 41

1    loud to you, and you'll see this in Government's exhibit 9.

2    I've put up two letters here, one from Yandri Orihuela

3    Alfonso, that's the top one here, and the bottom letter is

4    Lazaro Medina.

5          Now, let's look at the content of these letters,

6    ladies and gentlemen.  And keep in mind, first of all, that

7    this first letter was supposedly written by the man who

8    testified in court yesterday for the Defense, a man who

9    couldn't even spell his own first name right in the letter, a

10   man who refused to show up to a deposition after he was issued

11   a U.S. visa, not a Cuban visa, a U.S. visa.  So if he had

12   showed up to the deposition -- and according to him he was

13   afraid what Cuba would do.  Ladies and gentlemen, that visa

14   was issued by the United States.  Maybe he didn't show up to

15   that deposition because he knew that if someone found out he

16   lied, that the United States visa could be rescinded.

17         And the other letter, Lazaro Medina, who admitted to

18   you that he didn't write that letter.

19         So let's look at these letters.

20         The top one:  "I, Yandri Orihuela Alfonso, citizen

21   identification number, give this statement voluntarily,

22   without threat, without coercion."

23         Bottom letter:  "I, Lazaro Medina, holder of

24   identification card number, give the statement voluntarily,

25   without threats or coercion."

1          Top letter:  "I give this testimony to the United

2     States federal jail in the Southern District of Florida."

3          Bottom letter:  "I am giving this testimony to the

4     United States federal jail in the Southern District of

5     Florida."

6          Top letter:  "I left Cuba on March 7, 2008, headed

7     for the United States."

8          Bottom letter:  "I left Cuba on March 7th, 2008,

9     headed for the United States."

10         Top letter:  "This trip was my own decision.  I never

11    spoke with Mr. Alexis De La Cruz Suarez."

12         Bottom letter:  "This trip was my own decision.  I

13    never speak with Mr. Alexis De La Cruz."

14         Top letter:  "He didn't know anything about this

15    trip."

16         Bottom letter:  "He didn't know anything about this

17    trip."

18         Top letter:  "We arrived at Cay Sal, in the Bahamas."

19         Bottom letter:  "We arrived at Cay Sal, in the

20    Bahamas."

21         Top letter:  "Our raft was damaged, and we were

22    stopped and helpless until we were able to communicate with

23    our family in Cuba, and they called so our relatives would

24    attend to us because we were lost for several days."

25         Bottom letter:  "The raft we were in was damaged.  We

Page 43

1    were lost and helpless until we were able to get in touch with

2    our relatives in Cuba, and they called the family of one of

3    the people with us because we had been lost for several days

4    already."

5        Top letter:  "When he picked us up, he told us that

6    he couldn't take us to the United States, that he had to

7    deliver us to an American vessel because he was being

8    sanctioned and could not bring us all the way to here."

9        Bottom letter:  "Then he found us and told us that he

10   couldn't take us to the United States because he had to

11   deliver us to an American vessel, and in addition he was being

12   sanctioned and could not take us."

13       Top letter:  "This statement is truthful, and the

14   details are what I remember."

15       Bottom letter:  "This statement is sincere and

16   truthful, and it is all that I remember."

17       Top letter:  "If Mr. Alexis De La Cruz Suarez is

18   sentenced, an injustice is being committed because this fellow

19   man is innocent.  He never came to Cuba or influenced our

20   trip.  We thank Mr. Alexis if having saved our lives."

21       Bottom letter:  "If he is sentenced, it is not fair

22   because he is innocent because he didn't go to Cuba or have

23   anything to do with the trip, and all of us thank Mr. Alexis

24   profusely for having saved our lives."

25       I felt like there was an echo in there.  Those

Page 44

1   letters are almost identical, ladies and gentlemen.  One of

2   them didn't even spell his first name right, and the other

3   one, he admitted he never even wrote that letter.

4          And if you take a look at the other letters, there

5   are similarities, as well.  Everybody's thanking Mr. Alexis

6   profusely, and everybody makes sure to include that one

7   detail, that one very important detail that he told them, "I

8   can't take you to the United States, I have to turn you in to

9   the authorities."  Something to consider when you consider the

10  credibility of those witnesses, ladies and gentlemen.

11         Now, what else did we hear about?  Look through my

12  notes here.  Ladies and gentlemen, we heard about that GPS

13  unit again.  Mr. Abrams told you there was only one breadcrumb

14  on there, and we can't trust that one breadcrumb, but ladies

15  and gentlemen, there was only one breadcrumb on there because

16  somebody turned it off in between because he wanted to

17  minimize the number of breadcrumbs that would be found to

18  track him.

19         That GPS unit, Mr. Abrams said it was only the GPS

20  unit, you can't tell whose that was, what boat that was on,

21  where it was.  But guess what, ladies and gentlemen, that's

22  what circumstantial evidence is about.  That's what my

23  co-counsel, Mr. Schwartz, told you about.  No difference

24  between direct evidence and circumstantial evidence.  That GPS

25  unit was found onboard this vessel.  Heard that from two of

our Coast Guard officers. And on that GPS unit, ladies and gentlemen, on that GPS unit you heard about tracks and waypoints. The tracks told you exactly where that GPS unit was. That GPS idea started off in Miami, interestingly enough consistent with what the Defendant Mr. Padilla, and ended up just off the coast of Cuba in Matanzas.

Now, let me ask you something, ladies and gentlemen. Take a look at this. This point is off the coast of Cuba. Mr. Abrams wants you to think it's off the coast of Cay Sal. But do you go south to go north? If he was just heading to Cay Sal, why would you go further south? You wouldn't. It doesn't make sense. Reasonable doubt is about common sense. It doesn't make sense.

And guess what? Not only do we know that's where the GPS unit was, but we know that the Defendant intended to go to Matanzas because of the waypoints and the routes in the GPS unit. You heard from Mr. Abaunza, the GPS expert. He told you waypoints and routes are where someone intends to go because you have to enter that into your GPS unit. It doesn't just get there magically, somebody has to enter it. And guess what? That GPS unit was found onboard the Defendant's vessel. He went from Miami to Cuba and was heading back towards the United States, ladies and gentlemen.

Now, the only issue in this case, did the Defendant intend to head towards the United States or was this a rescue?

1    This wasn't a rescue, ladies and gentlemen.  The Defendant was

2    found in his vessel with these 18 aliens in the middle of the

3    night, no lights.  There were no visual distress signals

4    onboard that vessel, no flares.  He had a satellite phone, so

5    he could have called the Coast Guard, but he didn't, because

6    they were heading towards the United States.

7            Now, you can take a look at that video, and you'll

8    see lights, but those lights are the spotlight from the Coast

9    Guard lighting up the vessel.  And you heard from Mr. Alfonso,

10   who said, "oh, we were running with lights."  No, they

11   weren't.  It's clear as day on the video.  Take a look.

12           Now, what else do we know?  Well, common sense,

13   ladies and gentlemen.  According to the Defendant, he wants

14   you to believe -- he wants you to believe that when his family

15   members magically called from that magical cellphone, and that

16   he arrived some hours later, he knew his family was apparently

17   stranded on a deserted island, not in great shape.  So he

18   outfits his boat, he gets a boat, gets it ready, heads down to

19   the marina and heads out trying to look for them.  They didn't

20   know where they were.  They only found out supposedly that

21   they were in Cay Sal after they were on this cutter and

22   learned where they were.

23           So the Defendant gets on this boat and just randomly

24   heads out to sea to find his family?  That doesn't make any

25   sense, ladies and gentlemen, because if what he really wanted

Page 47

 1    to do was rescue his family, and if he was so sure that his

 2    intent was to turn these people over to the authorities, why

 3    didn't he just call the Coast Guard?  He's in Florida.  Why

 4    didn't he just call the Coast Guard and say, "my family is

 5    stranded on a desert island?"  The Coast Guard is obviously

 6    much more equipped to find these people in the middle of the

 7    ocean.  Because that's not what he intended to do.  He

 8    intended to bring these people to the United States.  It

 9    doesn't make any sense, ladies and gentlemen.

10         Now --

11         THE COURT:  You've got one minute of time left.

12         MS. SUNDARAM:  Yes, Your Honor, thank you.

13         And how do we know that the Defendant had this intent

14    to bring them to the United States?  Because he had that

15    intent in 2007 to smuggle aliens into the United States.  And

16    you can use that prior conviction as proof of his intent, his

17    unlawful intent.  The Judge will instruct you about that, and

18    I'm going to quickly go over those differences that Mr. Abrams

19    highlighted.

20         He said in that prior case he was convicted for

21    conspiracy to smuggle in aliens.  Yes, he was.  We don't

22    know -- we don't have any evidence as to what those other

23    counts were, ladies and gentlemen.  The intent in the

24    conspiracy to smuggle in aliens, it's the exact same intent as

25    we have here, ladies and gentlemen, except in that prior case

Page 48

1     there were two people, two smugglers, because there were 34

2     migrants.  In this case there was one smuggler with 18

3     migrants.

4              You charge a conspiracy, ladies and gentlemen, when

5     there were two people onboard.  That's the difference.

6              Now, no Coast Guard chase in this case.

7     Three-plus-hour Coast Guard chase in the last one.  Well,

8     guess what, ladies and gentlemen, the Defendant, he had a

9     broken engine.  You saw that in the pictures, in the video.

10    And he had been interdicted by the same exact Coast Guard

11    cutter, Cutter Chandeleur, the last time around.  So he knew,

12    even with two good engines the last time around he couldn't

13    outrun this 110-foot patrol boat.  He couldn't outrun them,

14    and this time he knew he had only had one good engine.

15    There's no way he can outrun them.  So of course he's going to

16    stop.

17             Couldn't come up with a story immediately, but over

18    time he managed to come up with this rescue story.  This isn't

19    Gilligan's Island, ladies and gentlemen.  We ask that you use

20    your common sense, evaluate the testimony and evaluate the

21    evidence and find the only verdict possible in this case.

22    This defendant, Alexis De La Cruz Suarez, on March 12th, 2008,

23    intended to bring those 18 aliens to the United States, and so

24    we ask that you find him guilty of all counts.

25             Thank you.

Page 49

1             THE COURT:  Ladies and gentlemen, would you like a

2    five-minute recess?  My instructions will take about 20

3    minutes to give you.  Would any of you, or do you want to go?

4    You want to go forward?

5             Okay.  All right.  Members of the jury, it's now my

6    duty to instruct you on the rules of law that you must follow

7    in deciding this case.  When I finish, you will go into the

8    jury room and begin your deliberations.

9             It will be your duty to decide whether the Government

10   has proven beyond a reasonable doubt the specific facts

11   necessary to find the Defendant guilty of the crime charged in

12   the second superseding indictment.

13            You must make your decision only on the basis of the

14   testimony and other evidence presented here during the trial

15   and not be influenced in any way by sympathy or prejudice for

16   or against the Defendant or the Government.  You must also

17   follow the law as I explain it to you, whether you agree with

18   that law or not.  And you must follow all of my instructions

19   as a whole.  You may not single out or disregard any of the

20   Court's instructions on the law.

21            The indictment, or formal charge against any

22   defendant, is not evidence of guilt.  Indeed, every defendant

23   is presumed by law to be innocent.  The law does not require a

24   defendant to prove his innocence or to produce any evidence at

25   all.  And if a defendant elects not to testify, you cannot

Page 50

1    consider that in any way during your deliberations.  The

2    Government has a burden of proving a defendant guilty beyond a

3    reasonable doubt, and if it fails to do so you must find the

4    Defendant not guilty.

5         While the Government's burden of proof is a strict or

6    heavy burden, it is not necessary that a Defendant's guilt be

7    proved beyond all possible doubt.  It is only required the

8    Government's proof exclude any reasonable doubt concerning the

9    Defendant's guilt.

10         A reasonable doubt is a real doubt based upon reason

11   and common sense after careful and impartial consideration of

12   all the evidence in the case.  Proof beyond a reasonable

13   doubt, therefore, is proof of such convincing character that

14   you would be willing to rely and act upon it without

15   hesitation in the most important of your own affairs.  If you

16   are convinced the Defendant has been proved guilty beyond a

17   reasonable doubt, say so.  If you're not convinced, say so.

18         As stated earlier, you must consider only the

19   evidence I have admitted into the case.  The term "evidence"

20   includes the testimony of the witnesses and exhibits admitted

21   into the record.  Remember that what the lawyers say is not

22   evidence in the case.  It's your own recollection and

23   interpretation of the evidence that controls.  What the

24   lawyers say is not binding upon you.  Also, do not assume from

25   anything I may have said that I have any opinion concerning

Page 51

1    any of the issues of this case.  Except for my instructions to

2    you on the law, you should disregard anything that I may have

3    said in the trial in arriving at your own decision concerning

4    the facts.

5         In considering the evidence, you may make deductions

6    and reach conclusions which reason and common sense lead you

7    to make and not be concerned about whether the evidence is

8    direct or circumstantial.  Direct evidence is the testimony of

9    one who asserts actual knowledge of a fact, such as an

10   eyewitness.  Circumstantial evidence is proof of a chain of

11   facts and circumstances tending to prove or disprove any fact

12   in dispute.  The law makes no distinction between the weight

13   you may give to either direct or circumstantial evidence.

14        Now, in saying you must consider all the evidence, I

15   do not mean you must accept all the evidence as true or

16   accurate.  You should decide whether you believe what each

17   witness had to say and how important that testimony was.  In

18   making that decision, you may believe or disbelieve any

19   witness, in whole or in part.  The number of witnesses

20   testifying concerning a particular matter in dispute is not

21   controlling.

22        In deciding whether you believe or do not believe any

23   witness, I suggest you ask yourselves a few questions:

24        Did the witness impress you as one who was telling

25   the truth?

Page 52

1          Did the witness have a particular reason not to tell

2     the truth?

3          Did the witness have a personal interest in the

4     outcome of the case?

5          Did the witness seem to have a good memory?

6          Did the witness have the opportunity and ability to

7     observe accurately the things about which he or she testified?

8          Did the witness appear to understand the questions

9     clearly and answer them directly?

10          Did the witness' testimony differ from other

11     testimony or other evidence?

12          So ask yourself was there some evidence tending to

13     prove a witness testified falsely concerning some important

14     fact, or whether there was evidence at some other time the

15     witness said or did something or failed to say or do something

16     which is different from the testimony the witness gave before

17     you during the trial.

18          Keep in mind, of course, that a simple mistake by a

19     witness does not necessarily mean the witness was not telling

20     the truth as he or she remembers it, because people naturally

21     tend to forget some things or remember other things

22     inaccurately.  So if a witness has made a misstatement, you

23     need to consider whether it was a simple -- it was simply an

24     innocent lapse of memory or an intentional falsehood.  And the

25     significance of that may depend upon whether it has to do with

Page 53

1   an important fact or with an unimportant detail.

2           The testimony of some witnesses -- let's see.

3           MR. ABRAMS:  Excuse me, Your Honor, that instruction

4   was pulled.

5           THE COURT:  Yes, we had agreed.  As I looked at it, I

6   saw that that was to be deleted.  Okay.  That was page 7,

7   instruction number 7.  It was deleted.

8           Now, when the Government offers testimony or evidence

9   that a defendant has made a statement or admission to someone

10  after being arrested or detained, the jury should consider the

11  evidence concerning such statement with caution and great

12  care.  It is for you to decide, one, whether the Defendant

13  made the statement; and, two, if so, how much weight to give

14  it.  In making those decisions, you should consider all the

15  evidence about the statement, including the circumstances

16  under which the Defendant may have made it.

17          During the course of the trial, you've heard evidence

18  of acts of the Defendant which may be similar to those charged

19  in this case, the second superseding indictment, but which

20  were committed on other occasions.  You must not consider any

21  of the evidence -- any of this evidence in deciding if the

22  Defendant committed the acts charged in this case, in the

23  present indictment.  However, you may consider that evidence

24  for other very limited purposes.

25          If you find beyond a reasonable doubt from other

Page 54

1    evidence in the case that the Defendant did commit the acts

2    charged in this case, which we call the second superseding

3    indictment, then you may consider evidence of the similar acts

4    allegedly committed on other occasions to determine, one,

5    whether the Defendant had the state of mind or intent

6    necessary to commit the crime charged in this case, or, two,

7    whether the Defendant committed the acts for which the

8    Defendant is on trial by accident or mistake.

9         Now, we'll explain the second superseding indictment,

10   this indictment in this case, which charges separate offenses

11   which we call counts.  I will not read it to you at length.

12   You'll have a copy of the indictment for reference in the jury

13   room if you wish to look at it.  I remind you that this

14   indictment is not evidence but merely a statement of the

15   formal charges against the Defendant.

16        In summary, the charges -- the counts charge the

17   Defendant with encouraging or inducing aliens to come to the

18   United States, knowing or in reckless disregard of the fact

19   that it would be a violation of law.

20        The Defendant is charged in the counts of the

21   second -- of this indictment with separate violations of 8

22   U.S.C., 8 United States Code, Section 1324(a)(1)(A)(iv).  This

23   law makes it a federal crime to knowingly encourage or induce

24   an alien to come to, enter or reside in the United States,

25   knowing or in reckless disregard of the fact that such coming

1    to, entry or residence is or will be a violation of law.

2          To find the Defendant guilty of this crime, you must

3    be convinced that the Government has proven each of the

4    following elements as to each alien separately listed in each

5    count of the indictment beyond a reasonable doubt.  These are

6    the elements that you must find beyond a reasonable doubt:

7          One, that the Defendant knowingly encouraged or

8    induced the person named in the indictment, the second

9    superseding indictment, to come to or enter the United States

10   in violation of law;

11         Two, that such person was then an alien; and

12         Three, that the Defendant knew or was in reckless

13   disregard of the fact that such person's coming to, entry in

14   the United States would be a violation of the law.

15         To act with reckless disregard means to be aware of

16   but consciously and carelessly ignore facts and circumstances

17   clearly indicating that the person's coming to or entry into

18   the United States would be in violation of law.

19         An alien is any person who is not a natural-born

20   citizen or a national of the United States.

21         The term "national of the United States" includes not

22   only a citizen, but a person who, though not a citizen, owes

23   permanent allegiance to the United States.

24         To "encourage" means to instigate, to incite to

25   action, to give courage to, to inspire, to embolden, to raise

1    confidence, to help, to forward and/or to advise.

2         To "induce" means to bring on or about, to affect,

3    cause, to influence an act or course of conduct, lead by

4    persuasion or reasoning, incite by motives and/or to prevail

5    upon.

6         The guilt of a defendant in a criminal case may be

7    proved without evidence that the Defendant personally did

8    every act involved in the commission of the crime charged.

9    The law recognizes that ordinarily anything a person can do

10   for one's self may be accomplished through the direction of

11   another person as an agent, or by acting with or under the

12   direction of another person or persons in a joint effort.

13        So if the acts or conduct of an agent or other

14   associate of the Defendant are willfully directed or

15   authorized by the Defendant, or if the Defendant aids or abets

16   another person by willfully joining together with that person

17   in the commission of a crime, then the law holds the Defendant

18   responsible for the conduct of that other person just as

19   though the Defendant had personally engaged in the conduct.

20        However, before any defendant can be held criminally

21   responsible for the conduct of others, it is necessary that

22   the Defendant willfully associate in some way with the crime

23   and willfully participate in it.  Mere presence at the scene

24   of a crime, and even knowledge that a crime is being

25   committed, are not sufficient to establish that a defendant

Page 57

1    either directed or aided and abetted in the crime.  You must

2    find beyond a reasonable doubt that the Defendant was a

3    willful participant and not merely a think spectator.

4              The indictment, you will note, charges the offense

5    was committed on or about a certain date.  The Government does

6    not have to prove with certainty the exact date of the alleged

7    offense.  It's sufficient if the Government proves beyond a

8    reasonable doubt the offense was committed on a date

9    reasonably near the date alleged.

10             The word "knowingly," as that term is used in the

11   second superseding indictment and these instructions, means

12   that the act was done voluntarily and intentionally and not

13   because of mistake or accident.

14             A separate crime or offense is charged in each count

15   of the superseding indictment.  Each charge, and the evidence

16   pertaining to it, should be considered by you separately.  The

17   fact you may find the Defendant guilty or not guilty as to one

18   of the offenses charged should not affect your verdict as to

19   any other offense charged.

20             I caution you, members of the jury, that you're here

21   to determine from the evidence in the case whether the

22   Defendant is guilty or not guilty.  The Defendant is on trial

23   only for the specific offenses alleged in this second

24   superseding indictment.

25             Also, the question of punishment should never be

Page 58

1    considered by the jury in any way in deciding the case.  If

2    the Defendant is convicted, the matter of punishment is for

3    the judge alone to determine at a later hearing.

4             Okay.  Yes, notetaking.  I've told you you can take

5    notes if you wish, and some of you, maybe all of you, have

6    done so from time to time.  You'll have your notes available

7    with you during your deliberations, but you should make use of

8    them only as an aid to your memory.  In other words, don't --

9    you should not give your notes any precedence over your

10   independent recollection of the evidence or the lack of

11   evidence, and neither should you be unduly influenced by notes

12   taken by one of the other jurors.

13            I emphasize that notes are not entitled to any

14   greater weight than the memory or impression of each juror as

15   to what the testimony may have been.

16            Now, any verdict you reach in the jury room, whether

17   guilty or not guilty, must be unanimous.  All 12 of you must

18   agree.  The two alternates will be excused when you go out,

19   but the 12 of you that are in the jury room must agree to the

20   verdict that you reach on each count.  You will never have to

21   explain your verdict to anybody.

22            It's your duty as jurors to discuss the case with one

23   another in an effort to reach agreement, if you can do so.

24   Each of you must decide the case for yourself, but only after

25   a full consideration of the evidence with the other members of

1    the jury.  While discussing the case, don't hesitate to

2    reexamine your own opinion and change your mind if you become

3    convinced that you were wrong, but do not give up

4    honestly-held beliefs because others think differently or

5    merely to get the case over with.

6         Remember that in a very real way, you are judges,

7    judges of the facts.  Your only interest is to seek the truth

8    from the evidence in the case.

9         When you go in the jury room, the first thing you do

10   is to select one of your members to act as your foreperson,

11   who will preside over your deliberations and date and sign

12   your verdict.  We have prepared a verdict form for you which

13   you will have with you in the jury room.  It reads:

14        "United States versus Alexis De La Cruz Suarez.

15        "Verdict:  We, the jury, unanimously find the

16   Defendant as it to Count 1 of the superseding indictment," and

17   there's two spaces.  You just put an X or checkmark in your

18   unanimous decision.  The foreperson does this.  And the two

19   spaces are "guilty" or "not guilty."

20        "We, the jury, unanimously find the Defendant as to

21   Count 3, guilty, not guilty."  And it's all the same way

22   through each of the counts, the counts being 1, 3, 5, 6, 7, 8,

23   10, 11, 12, 13, 14, 15, 16, 17, 18.

24        To summarize or simplify a bit, each of the counts

25   after Count 1 are the names of individual people that the

1    Government alleges were on that boat and which they have the

2    burden of proving beyond a reasonable doubt were actually

3    being attempted to be brought into the United States.  So all

4    of them deal with the individuals.  That's the difference in

5    the 18 counts.

6         All right.  If you desire to communicate with the

7    Court at any time, have your foreperson write on a note or a

8    pad, yellow pad or whatever, your question or your inquiry and

9    give it to the marshal.  He will bring it out, I'll assemble

10   the lawyers, and we will discuss the answer and send the

11   answer back in to you.

12        I urge you if you have a question about the law that

13   you take a look and see if you can find the answer in the

14   instructions which I have just read to you.  A lot of it

15   looked like I was perhaps talking to you because I've done it

16   so many times in 40 years, thousands of times.  So I sort of

17   have the instructions memorized.  So -- but it's in printed

18   form, and you'll have a copy with you.  You'll, in fact, have

19   two copies.

20        So if you have a question about the law -- I don't

21   think you will, but if you do, take a look at this.  If you

22   have a question about the facts, we can't answer that for you.

23   I mean, you know, just rely on your collective memories.  I

24   mean, you can write a question out, whatever you want to, and

25   we'll write back.  But on the facts, you folks have to decide

1    that.  The law, of course, if you need help with that, well,

2    that's another matter.

3         We will give you two copies of the instructions, we

4    will give you a copy of the second superseding indictment.

5    That's this piece of paper.  And you will see black marks on

6    here which have been deleted.  Those were counts that the

7    Government has withdrawn.  They're not involved in this case.

8    And the lawyers have all looked at all this, and they all

9    agree that this is a -- you know, that this is the paperwork

10   that should go with you.  And here is one copy of the verdict

11   form.  You have the verdict, the indictment, second

12   superseding indictment, two copies of the charges.

13        Now, then -- oh, yes, I should tell you this.  If

14   anybody -- if you do send a note out for any reason, do not

15   tell me anything about how you're numerically divided or

16   anything like that.  I'll tell you a funny story about that

17   after the case is over, but basically don't -- you know, don't

18   write down what you all are talking about or how you're voting

19   or anything like that.  The question should be very short,

20   very simple if you send one out.  I don't think you will

21   probably have any questions, but if you do, fine.

22        All right.  Marshal, let me give these documents to

23   you, and at this time we will -- you are excused to deliberate

24   on your verdict.  We have ordered some lunch for you which

25   hopefully will be forthcoming, and so you'll be in

Page 62

1    deliberation as long as you choose.  The exhibits will be

2    brought in to you in a moment.

3            Thank you.

4        (At 10:41 a.m., the jury exits the courtroom to deliberate

5    upon its verdicts.)

6            THE COURT:  The two alternates.  Yes.  The two

7    alternates, please, sir -- go with them, Joyce.  The two

8    alternates.  Thank you, sir, and thank you, ma'am, the two

9    alternates, for being with us.  We really appreciate your

10   help.  I think we've ordered sandwiches, but I'm not sure

11   they're here yet.  But anyway, Joyce will take care of it.  If

12   you've got sandwiches, take them with you, enjoy them or

13   whatever.

14           Thank you.

15           Now, we'll ask the lawyers to go over the exhibits to

16   make sure that only the exhibits are actually admitted into

17   evidence go into the jury room.  We will not send in there

18   electronic gadgetry to run the devices unless they ask for it.

19           MR. ABRAMS:  Yes, sir.

20           THE COURT:  I will remind counsel, all counsel, the

21   defense counsel, that I'm sure that Mr. Abrams, because he

22   always does, intended to renew his Rule 29 motion at the

23   conclusion of all the evidence, but yesterday, because we came

24   back and under the circumstances after lunch, I'm going to

25   consider that that was simply the -- you will recall that

1    yesterday the jury came back at 2:00 o'clock.  The Defendant

2    had not rested at that point, since there was a possibility

3    the Defendant might or might not testify.  And if the

4    Defendant did, there were to be other witnesses in rebuttal

5    from the Government, I believe a probation officer, perhaps

6    someone else, perhaps not.

7         At 2:00 o'clock, the jury, who had come back here

8    just for that, and out of consideration for not keeping the

9    jury tied up, we let them, when the announcement was made by

10   Mr. Abrams that his client had decided not to testify, that --

11   and that there would be no further testimony, then we all

12   realized that the Defendant was resting.  In fact, the

13   Defendant did rest.  The Government then did not have any

14   rebuttal, and so that concluded the testimonial part of the

15   case.

16        Because the Court and the lawyers were trying to be

17   considerate of the jury and not have them sit there while we

18   listened to further legal arguments on Rule 29 at the

19   conclusion of all of the evidence, we excused the jury and

20   went right into a charge conference.

21        Under those circumstances, the Court finds that it is

22   perfectly reasonable and understandable that the Rule 29

23   motion at the conclusion of all the evidence that Mr. Abrams

24   unquestionably would have made, since he's made it maybe, I

25   don't know, what, a hundred cases before me, and I know he

Page 64

1   always makes them, he's a very careful lawyer, would have been

2   made.

3          So the Court rules as a matter of law that this

4   motion is now being timely made, timely made.  Now, this is

5   very significant and important, because if that is not made

6   there are some cases that indicate that certain waivers may or

7   may not flow from that, and I want to protect the Defendant in

8   the sense that this is fair, proper and reasonable, and so

9   that's it.

10          Now, make your motion.

11          MR. ABRAMS:  Yes, sir.  Thank you.  That was one of

12   the items on my list.

13          Your Honor, pursuant to Rule 29 of the Federal Rules

14   of Criminal Procedure, we would respectfully renew our motion

15   for judgment of acquittal as to each count in which Mr. De La

16   Cruz Suarez is charged, arguing that the Government has failed

17   to prove at this juncture beyond a reasonable doubt as a

18   matter of law that Mr. De La Cruz has committed any of the

19   offenses enumerated in the second superseding indictment.

20          MR. SCHWARTZ:  Your Honor, we would again rely on the

21   videotape of the Defendant running without lights on, the

22   testimony of the witnesses that he was heading northbound

23   towards the United States, the Defendant's own statement that

24   he was taking his family to the United States and that he went

25   to Cuba to pick them up, and the GPS data showing that his

1    vessel was right off the coast of Cuba earlier that morning.

2          Viewing the evidence in the light most favorable to

3    the Government, we believe that we have demonstrated our case

4    beyond a reasonable doubt to survive the Rule 29 standard.

5          THE COURT:  All right.  Having had the benefit of

6    your closing arguments, each of you, the Court will also take

7    that into consideration ruling on this motion.  The motion is

8    denied.  It is clear that the Government has established

9    sufficiently the evidence, which, if believed by the jury,

10   would sustain a verdict of guilty if that should be their

11   decision.

12         All right.

13         MR. ABRAMS:  Your Honor, I had one additional matter.

14   And with all due respect to Mr. Schwartz, and I most

15   certainly, as Your Honor knows, hate interrupting anyone's

16   closing arguments, but I feel constrained to move for a

17   mistrial with respect to this matter.  The Government, during

18   closing argument, made numerous references to Mr. De La Cruz

19   Suarez's prior conviction.  I did not make reference and say

20   anything after the first reference.

21         After the second one, with respect to Mr. De La

22   Cruz's use of a satellite phone and why he would throw it over

23   the side of the boat, there was reference he knew from his

24   previous experience.  And, Judge, that is not -- that is not

25   using the 404(b) with respect to intent, that is showing he

1   did it before, therefore he's doing something again based on

2   what he learned from his past case.  I reserved a motion when

3   that satellite phone reference was made.  There were at least

4   three references to the prior conviction.  The last one, which

5   Ms. Sundaram made in rebuttal, I did not have an issue with

6   because she confined that to the issue of intent.  But with

7   respect to the other references to the prior conviction, we

8   believe it was improper, it was using 404(b) for the wrong

9   purpose, and we would move for mistrial on that basis.

10          MR. SCHWARTZ:  Your Honor, the reference to the

11   satellite phone was meant exactly --

12          THE COURT:  Why don't you come up here.  Take your

13   time.  Come up.  Everybody be seated except the lawyers that

14   are speaking.

15          MR. SCHWARTZ:  Your Honor, the reference to the

16   previous conviction with respect to the satellite phone was

17   used exactly --

18          THE COURT:  You can have a seat, Mr. Abrams.

19          Start again.  With what?

20          MR. SCHWARTZ:  Your Honor, the reference that I made

21   to the previous conviction and the satellite phone was made

22   directly to deal with the issues of intent, state of mind and

23   absence of mistake.  He didn't accidentally throw over that

24   phone, he did it with an intention, and the intention was

25   because he was smuggling migrants.  It goes to the state of

1    mind, which is exactly what 404(b) evidence is used for.

2         THE COURT:  The motion for mistrial is denied.  The

3    remarks of counsel, they're entirely appropriate at closing

4    argument with respect to the evidence in this record.  The

5    matter of the Defendant's intent to go to Cuba and bring back

6    undocumented or unauthorized aliens to the United States is

7    the issue in this case.  The Defendant says he didn't do it;

8    the Government says he did.  The Government attempted to prove

9    it, and his -- him saying that he did not commit the crime,

10   his intent is clearly and squarely at issue.

11        And circumstantial evidence tending to show that he

12   covered up the crime, if he committed the crime, if the jury

13   finds he committed the crime -- and it seems the evidence is

14   very substantial on this point -- that definitely goes to his

15   intent to commit the crime.  The cover-up would be part of it.

16   And destroying evidence that would prove that he had been to

17   Cuba, if the jury should find that from this record -- and

18   that's a reasonable argument based on the evidence that was in

19   the record -- so clearly there is no impropriety in the

20   remarks of counsel.

21        The motion is denied.

22        All right.  We'll be in recess until we hear from the

23   jury.

24        Now, if you go away from the courthouse, I want you

25   to leave your numbers, your cellphone numbers here, so that

Page 68

1    you can be reached so that we can reassemble quickly.  I don't

2    want this jury having to wait unduly for us to reassemble and

3    answer questions.

4           It's now ten minutes of 11:00.  I will expect all

5    counsel to remain in the courthouse until 12:00 o'clock.  At

6    12:00 o'clock we will reevaluate the situation to see if we

7    can have a noon recess for you to leave the courthouse.  Other

8    than that, I'd like for you to stay right here.

9           And that includes the interpreters, the court

10   reporter, the courtroom deputy, myself, everybody.

11          All right.  We'll be in recess.

12       (A recess was taken from 10:51 a.m. to 1:44 p.m.)

13          THE COURT:  Thank you.

14          The jury's coming.

15       (The jury enters the courtroom, after which the following

16   proceedings were had:)

17          THE COURT:  Thank you.  Be seated.

18          Would the foreman hand the verdict to the marshal,

19   who will hand it to me.  Thank you very much.

20          All right.  Would you publish the verdict.

21          As she -- well, publish the verdict, excuse me.

22          THE COURTROOM DEPUTY:  United States District Court,

23   Southern District of Florida, Case Number 08-10017-CR-KING,

24   United States of America versus Alexis De La Cruz Suarez.

25          We, the jury, unanimously find the Defendant as to

1    Count 1 of the second superseding indictment, guilty.

2              We, the jury, unanimously find the Defendant as to

3    Count 3 of the second superseding indictment, guilty.

4              We, the jury, unanimously find the Defendant as to

5    Count 5 of the second superseding indictment, guilty.

6              We, the jury, unanimously find the Defendant as to

7    Count 6 of the second superseding indictment, guilty.

8              We, the jury, unanimously find the Defendant as to

9    Count 7 of the second superseding indictment, guilty.

10             THE COURT:  Let me interrupt you just a moment.  I

11   have reviewed the verdict, and all of the counts are marked

12   guilty.  So may we consider that instead of reading through

13   each one?  Any objection?  We've announced it in open court.

14   I'll ask Mr. Hyatt, is that correct, that each of the items

15   were marked guilty; is that correct?

16             JUROR HYATT:  Yes, Your Honor.

17             THE COURT:  And that was the unanimous verdict of the

18   jury; is that correct?

19             JUROR HYATT:  Yes, Your Honor.

20             THE COURT:  Is there any objection to waiving the

21   monotonous reading of all the counts, Mr. Abrams?

22             MR. ABRAMS:  No, sir.

23             THE COURT:  The Government?

24             MR. SCHWARTZ:  No, sir.

25             THE COURT:  Do either of you wish the jury polled?

```
 1              MR. ABRAMS:  Yes, Your Honor.

 2              THE COURT:  All right.

 3              THE COURTROOM DEPUTY:  Ladies and gentlemen of the

 4    jury, is this your verdict as read?

 5              Juror number 1?

 6              JUROR ROGERS:  Yes.

 7              THE COURT:  Let me interrupt.

 8              As your names are read, just say yes or no.  She's

 9    going to ask you is this your verdict.  You can just say yes

10    or no as the case may be.

11              THE COURTROOM DEPUTY:  Homer Rogers?

12              JUROR ROGERS:  Yes.

13              THE COURTROOM DEPUTY:  Sandra Hurtubise?

14              JUROR HURTUBISE:  Yes.

15              THE COURTROOM DEPUTY:  Fred Gartenmayer?

16              JUROR GARTENMAYER:  Yes.

17              THE COURTROOM DEPUTY:  Catherine Corcoran?

18              JUROR CORCORAN:  Yes.

19              THE COURTROOM DEPUTY:  Christine Ledwith?

20              JUROR LEDWITH:  Yes.

21              THE COURTROOM DEPUTY:  Francine Gelman?

22              JUROR GELMAN:  Yes.

23              THE COURTROOM DEPUTY:  Thomesha Milian?

24              JUROR MILIAN:  Yes.

25              THE COURTROOM DEPUTY:  Mark Hyatt?
```

1          JUROR HYATT:  Yes.

2          THE COURTROOM DEPUTY:  Rene Michelle Romo?

3          JUROR ROMO:  Yes.

4          THE COURTROOM DEPUTY:  Gary Someillan?

5          JUROR SOMEILLAN:  Yes.

6          THE COURTROOM DEPUTY:  Valerie Mathijsen-Palay?

7          JUROR MATHIJSEN-PALAY:  Yes.

8          THE COURTROOM DEPUTY:  Elisse Kulbaba?

9          JUROR KULBABA:  Yes.

10          THE COURT:  All right.  Since the sound system is not

11   good and my hearing is bad, let me make sure.  She has asked

12   each and every one of you if this was the verdict as read and

13   as announced; that is, guilty to all of the counts.  She's

14   asked each of you is that your verdict, and it's my

15   understanding, although I didn't quite hear all of it, but

16   it's my understanding that each of you answered "yes, that is

17   my verdict."  Am I correct in that?  Is there anybody who

18   disagrees with what I just said?  Fine.

19          All right.  Ladies and gentlemen, we thank you very

20   much for your careful attention to the case.  I promised you a

21   cute little story about juries, and so while I take care of a

22   couple of things here, it's only going to take five minutes,

23   if some of you have a pressing need, please go on with our

24   thanks.  But in the meantime, I'll meet with you in five

25   minutes to keep my promise to tell you that and answer any

Page  72

 1    questions you may have about the procedure or what we do in

 2    the Southern -- anything else.  I always likes to visit with

 3    the jury for a few minutes if they want to, if you want to

 4    visit with me.  We're talking about a five-minute visit there

 5    is all.

 6          So those of you that would like to remain for just a

 7    few minutes, won't take more than -- I don't want to hold

 8    anybody up.  If you have things to do, please go on.  You

 9    won't offend me if you leave, but if anybody wants to stay for

10    a few minutes, I'll visit with you in about five minutes.

11          In the meantime, Joyce will hand out an envelope that

12    expresses our appreciation and thanks, has a little

13    certificate there that I signed for each of you.  If we do

14    this in another 40 years, we'll have one of these certificates

15    in every home on the island, I guess.

16          They can take them in the jury room.  Let's get them

17    on out of the way so I can go on with this.  Thank you.

18       (The jury exits the courtroom.)

19          THE COURT:  All right.  Alexander De La Cruz Suarez,

20    the jury, having found you guilty of each of the counts in

21    this verdict, on this date, the Court adjudicates you guilty

22    of the charges contained in Counts 1, 3, 5, 6, 7, 8, 10, 11,

23    12, 13, 14, 15, 16, 17 and 18.

24          Sentencing will be scheduled at a later date when we

25    have all of our schedules in hand.  It will be

Page 73

1   approximately -- it will be approximately 60 to 75 days hence.

2   It probably will be in Miami.  It could be here in Key West if

3   I'm down here at that particular time.  It will depend upon

4   the presentence investigation report, the time it takes the

5   probation officer.  Is the probation officer present here?

6           THE COURTROOM DEPUTY:  No, Judge.

7           THE COURT:  No.

8           He should always be called.  We should get him down

9   whenever --

10          In any event, the probation officer, we will refer

11  the matter to the probation office for preparation of the

12  presentence investigation report.  It will be scheduled for

13  sentencing, as I say, tomorrow or Monday, when we get a chance

14  to look at our schedule.

15          Marshal, if you can clear the aisle.  The Defendant

16  is remanded to the custody of the United States Marshal at

17  this time.

18          MR. ABRAMS:  Your Honor, Mr. De La Cruz has requested

19  if possible that his sentencing hearing be held in Miami due

20  to the location of his family.

21          THE COURT:  I think we can accommodate that, but

22  we'll take care of that on Monday.

23          MR. ABRAMS:  Yes, sir.

24          THE COURT:  If the aisle is clear, you can take the

25  Defendant out.  I will -- the Defendant can leave.  I'm going

Page 74

1    to deal with the exhibits now.  The exhibits will be brought

2    back.  The Defendant can leave.

3            I'm going to -- all exhibits will be brought back by

4    the marshal into the courtroom in a few minutes.  As is our

5    customary practice here, because we do not have the facilities

6    to -- for my clerk to take charge of them for the Clerk's

7    office, we will deliver them to whichever side offered them,

8    or perhaps it's better just to deliver all exhibits to the

9    case agent for his safekeeping, transportation, against

10   whatever may be necessary for the -- in the event of an appeal

11   or whatever.  So that's our tradition.

12           Do we all agree?  Do you agree with that?

13           MR. ABRAMS:  Yes, sir.

14           Judge, I would just ask that Defense exhibits C, D,

15   E, and F-1, which are the transcripts from the -- from the

16   testimony of the Cuba witnesses, those be filed and made part

17   of the court record, because there isn't going to be a

18   separate transcript made of their testimony.  That way it's

19   part of the court record.

20           THE COURT:  Very sensible.

21           See, with all this new gadgetry, it doesn't take

22   things like that into account, you know.  So I don't know, but

23   you can work with -- I guess you'll have to go to the

24   supervisor back up in town in Miami to find out how all that's

25   done.

1        Joyce, we don't have any facilities.  We can gather

2   up all the transcripts to give them to Mr. Abrams, and he can

3   take them to your supervisor, and she can put them in a box,

4   can't she, in the appeals section?

5        THE COURTROOM DEPUTY:  Right.

6        THE COURT:  No, she can't take care of it.  I mean, I

7   agree with you that needs to be done.  Let the record reflect

8   that the copies of the transcripts that you've just mentioned,

9   which were not taken down by the court reporter pursuant to

10  our agreement and understanding, but -- so that is the record

11  of what was presented in this trial.  That must go with the

12  appellate record.  So we will -- we'll ask Mr. Abrams to

13  remain for a few minutes, or --

14        MR. ABRAMS:  Yes, sir.

15        THE COURT:  And when the marshal brings all those

16  transcripts back in here, you and Mr. Schwartz or someone or

17  the agent can go through them, and you will make sure that we

18  have a complete copy of each transcript that was video-read

19  into the record.  And then we will turn those over to

20  Mr. Abrams, and he can take them to the appeals section of the

21  Clerk's office in Miami, Florida.  Not my office.

22        MR. ABRAMS:  Yes, sir.

23        THE COURT:  Joyce can't -- there's nothing she can do

24  with that.

25        And ask them to be recorded and attached as part of

1    the record and tell them it's very important, very important.

2              MR. ABRAMS:  Yes, sir.

3              THE COURT:  All right.  Is there anything else at

4    this point?  No?

5              MR. SCHWARTZ:  Nothing further from the Government,

6    Your Honor.  Thank you.

7              MR. ABRAMS:  No, Your Honor.

8              THE COURT:  All right.  Thank you.

9         (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 77

```
1                        * * * * *

2                       I N D E X

3    Closing Arguments

4          By Mr. Schwartz                  2

5          By Mr. Abrams                   21

6          By Ms. Sundaram                 36

7    Court's Charge to the Jury            49

8    Rule 29 (Renewed)                     62

9    Jury Verdict                          68

10                      * * * * *

11                    E X H I B I T S

12   (None.)

13                      * * * * *

14                    CERTIFICATE

15      I, Stephen W. Franklin, Registered Merit Reporter, and

16   Certified Realtime Reporter, certify that the foregoing is a

17   correct transcript from the record of proceedings in the

18   above-entitled matter.

19      Dated this 10th day of JUNE, 2010.

20

21         /s/Stephen W. Franklin
     _____
22   Stephen W. Franklin, RMR, CRR

23

24

25
```

**A**

**Abaunza (2)** 12:13 45:17
**abets (1)** 56:15
**abetted (1)** 57:1
**ability (1)** 52:6
**able (12)** 9:2 10:6 14:7 23:1,3 32:2,3,9,11 39:10 42:22 43:1
**aboard (9)** 2:24 4:16 6:19 9:5,24 11:17 12:12 19:8 20:20
**above-entitled (1)** 77:18
**Abrams (40)** 1:19 10:1 11:25 21:16,17,23 27:16 37:1,18,22 39:19,25 40:14 44:13,19 45:9 47:18 53:3 62:19,21 63:10,23 64:11 65:13 66:18 69:21,22 70:1 73:18,23 74:13 75:2,12,14 75:20,22 76:2,7 77:5
**absence (1)** 66:23
**absolutely (2)** 6:10 19:7
**accept (1)** 51:15
**accident (2)** 54:8 57:13
**accidentally (1)** 66:23
**accommodate (1)** 73:21
**accomplished (1)** 56:10
**account (1)** 74:22
**accurate (1)** 51:16
**accurately (1)** 52:7
**acquittal (1)** 64:15
**act (7)** 7:6 50:14 55:15 56:3,8 57:12 59:10
**acting (1)** 56:1
**action (1)** 55:25
**activity (1)** 10:6
**acts (6)** 53:18,22 54:1,3,7 56:13
**actual (2)** 11:2 51:9
**Adam (2)** 1:16 19:19
**addition (1)** 43:11
**additional (1)** 65:13
**adjudicates (1)** 72:21
**admission (1)** 53:9
**admitted (6)** 37:22 41:17 44:3 50:19,20 62:16
**advise (1)** 56:1
**affairs (1)** 7:7 50:15
**affect (3)** 8:10 56:2 57:18
**AFPD (1)** 1:19
**afraid (1)** 41:13
**agent (5)** 21:23 56:11,13 74:9 75:17
**ago (3)** 22:6 25:25 26:1
**agree (9)** 21:25 23:6 49:17 58:18,19 61:9 74:12,12 75:7
**agreed (1)** 53:5
**agreement (2)** 58:23 75:10
**ahead (3)** 10:3 12:2 27:15
**aid (1)** 55:8
**aided (1)** 57:1
**aids (1)** 56:15
**Alexander (1)** 72:19
**Alexis (32)** 1:6 15:18 23:7 24:4 26:3,3,4,13,14 29:25 30:3 31:17,19,19 32:1 33:11,15,20,22 34:7,10 36:4,18 42:11,13 43:17,20,23 44:5 48:22 59:14 68:24
**Alfonso (7)** 30:11 31:17 37:12 39:22 41:3,20 69
**Alfredo (1)** 55:11
**alien (8)** 5:3 9:12 10:11 23:12 54:24 55:4,11,19
**aliens (21)** 2:22 5:13,16 7:20 10:10 11:4,9 13:9 21:5,7 34:12 36:19 39:2,3 46:2 47:15,21,24 48:23 54:17 67:6
**alleged (3)** 57:6,9,23
**allegedly (1)** 54:4
**alleges (1)** 60:1
**allegiance (1)** 55:23
**Alonso (1)** 30:11
**alternates (5)** 58:18 62:6,7,8,9
**amazed (1)** 22:2
**America (2)** 1:3 68:24
**American (2)** 43:7,11
**American-flagged (2)** 3:18,24
**analysis (1)** 2:10
**analyzing (1)** 7:10
**and/or (2)** 56:1,4
**announced (2)** 69:13 71:13
**announcement (1)** 63:9
**answer (7)** 52:9 60:10,11,13,22 68:3 71:25
**answered (1)** 71:16
**anti-smuggling (1)** 66:4
**anyone's (1)** 65:15
**anyway (1)** 62:11
**apparently (1)** 46:16
**appeal (1)** 74:10
**appeals (2)** 75:4,20
**appear (5)** 30:12,12,13,19 52:8
**Appearances (1)** 1:15
**appeared (4)** 6:13 30:8,9,19
**appears (2)** 14:24 36:16
**appellate (1)** 75:12
**applies (1)** 7:19
**appreciate (1)** 62:9
**appreciation (1)** 72:12
**approach (1)** 4:4
**appropriate (1)** 67:3

**approximately (3)** 24:2 73:1,1
**April (1)** 16:2
**arguing (1)** 64:16
**argument (4)** 2:8 65:18 67:4,18
**arguments (5)** 1:10 63:18 65:6,16 77:3
**Ariacna (5)** 9:6 19:9 27:4,6 39:9
**arranged (2)** 15:10,11
**arrested (1)** 53:10
**arrived (4)** 14:16 42:18,19 46:16
**arriving (1)** 51:3
**asked (13)** 5:4 16:7,14 17:23 18:6 22:25 28:4 29:4 31:17,21 40:13 71:11,14
**asking (1)** 28:5
**asks (2)** 26:25 29:11
**assemble (1)** 60:9
**asserts (1)** 51:9
**associate (2)** 56:14,22
**assume (1)** 50:24
**assuming (1)** 24:4
**attached (1)** 75:25
**attempt (1)** 22:10
**attempted (2)** 60:3 67:8
**attend (1)** 42:24
**attention (2)** 21:25 71:20
**attorney (2)** 15:8 39:13
**attributed (1)** 29:24
**attributes (1)** 26:13
**aunt (1)** 14:19
**AUSA (1)** 1:16
**authorities (4)** 15:3 36:21 44:9 47:2
**authorized (1)** 56:15
**available (2)** 32:14 58:6
**aware (1)** 55:15
**Azcui (9)** 9:6 10:25 15:24 27:4,7,17,22 28:18 39:5
**Azcui's (1)** 28:21
**a.m (2)** 62:4 68:12

**B**

**B (2)** 26:9 77:11
**back (31)** 3:4 7:12,17 9:3,23 10:18,19 12:23 13:7 18:4,25 22:21 23:5,17 28:3,8,10,16 37:17 40:21 45:22 60:11,25 62:24 63:1,7 67:5 74:2,3 74:24 75:16
**Bacunayagua (2)** 31:12,14
**bad (2)** 4:3 71:11
**Bahamas (2)** 42:18,20
**Bahamian (1)** 24:22
**bail (2)** 32:10,15
**bailed (1)** 32:10
**Bank (6)** 14:4 20:22 24:1,21,23 25:9
**barely (1)** 20:19
**based (6)** 6:8 7:3 17:13 50:10 66:1 67:18
**basically (2)** 12:15 61:17
**basis (3)** 49:13 66:9
**bat (1)** 24:3
**Bay (2)** 12:19 25:4
**beach (6)** 1:23 3:12 19:11 28:25,25 32:3
**bear (1)** 3:20
**bed (1)** 6:4
**beginning (1)** 5:11
**beliefs (1)** 59:4
**believe (13)** 2:15 14:2 34:25 35:1 46:14,14 51:16 51:18,22,22 63:5 65:3 66:8
**believed (1)** 65:5
**benefit (1)** 65:5
**best (2)** 6:2 30:24
**better (3)** 5:7 34:23 74:8
**beyond (18)** 6:18,22 7:15,22 21:11 49:10 50:2,7 50:12,16 53:25 55:5,6 57:2,7 60:2 64:17 65:4
**big (2)** 26:20,20
**biggest (1)** 35:25
**binding (2)** 2:10 50:24
**Biscayne (2)** 12:19 25:4
**bit (6)** 4:14 17:2 22:19,21 23:16 59:24
**black (4)** 5:7 12:19 22:15 61:5
**blackboard (1)** 23:1
**blame (1)** 16:22
**board (1)** 4:2
**boarded (3)** 3:13 9:7,15
**boarding (3)** 4:21 5:5 11:17
**boardings (5)** 25:24,25 26:1,1,11,24 37:7
**boat (35)** 2:23 3:14 4:20,4:3,16 8:20 9:9 17:8,16 17:17 19:8,10,10,14,22 20:18 21:7 23:8,10,10 24:4,7 25:2,20 27:7,19,22,23 28:1,8,10,13,16 28:17 29:5,8,10 31:1 32:10,10,14,14 33:19,21 34:1,2 36:16 44:20 46:18,18,23 48:13 60:1 65:23
**bogus (1)** 16:25
**boot (4)** 32:11,12,15 40:4
**border (3)** 27:21,23 28:6
**born (1)** 29:14
**bottled (1)** 4:24
**bottles (1)** 9:13
**bottom (11)** 41:3,23 42:3,8,12,16,19,25 43:9,15 43:21
**box (1)** 75:3
**breadcrumb (5)** 25:7,8,10 44:13,14,15

**breadcrumbs (3)** 12:15 25:13 44:17
**breaks (1)** 4:3
**Brief (1)** 21:20
**briefly (2)** 5:17 33:24
**bring (10)** 8:2 23:6 36:19 43:8 47:8,14 48:23 56:2 60:9 67:5
**brings (1)** 75:15
**broken (1)** 48:9
**brother (6)** 15:11 16:7,7,8 30:6 32:2
**brother-in-law (1)** 18:24
**brought (6)** 37:1,2 60:3 62:2 74:1,3
**bunch (1)** 15:8
**burden (15)** 6:15,17,17,20 7:14,24 16:25 35:8,9 35:15,16 50:2,5,6 60:2
**bus (2)** 31:2 40:3
**B-a-c-a (1)** 31:12
**B-a-c-u (1)** 31:12
**B-a-c-u-n-a-y-a-g-u-a (1)** 31:13

**C**

**C (1)** 74:14
**cabin (7)** 5:1 19:11 28:2,2,2,7,15
**call (8)** 2:1 17:6 36:13 38:21 47:3,4 54:2,11
**called (6)** 7:22 42:23 43:2 46:5,15 73:8
**calls (5)** 30:8 33:2,3,9,14
**call's (1)** 14:15
**canned (2)** 4:24 9:14
**captain (1)** 23:19
**card (1)** 41:24
**cards (1)** 10:23
**care (7)** 4:25 19:2 53:12 62:11 71:21 73:22 75:6
**careful (4)** 7:3 50:11 64:1 71:20
**carelessly (1)** 55:16
**case (80)** 2:12 11,16 5:9,12,25 6:15 7:5,15 17:1 17:10 18:20,23 19:3,16 21:6,13,25 22:1,9,13 22:23 23:6,11,12,15,18 27:18 30:6 33:9,25 34:1,2,3,5,6 35:8,25 36:3,4 37:20,24 38:15 45:24 47:20,25 48:2,6,21 49:7 52:12,12 51:1 52:4 53:19,22 54:1,2,6,10 56:6 57:21 58:1 58:22,24 59:1,5,8 61:7,17 63:15 65:3 66:2 67:7 68:23 70:10 71:20 74:9
**cases (6)** 35:18,22,23 36:1 63:25 64:6
**casual (1)** 31:19
**Catherine (1)** 70:17
**caught (3)** 10:19 11:14 17:25
**cause (2)** 8:10 56:3
**caused (1)** 8:11
**caution (2)** 53:11 57:20
**Cay (17)** 14:4 17:20 20:22,24 24:1,21,22 25:9,9 32:18,23,24 42:18,19 45:9,11 46:21 46:15 67:25
**cellphone (10)** 14:12 33:5,7,8 37:25 38:20,20,22 46:15 67:25
**cellphones (5)** 14:6,7,10 33:2 36:13
**center (2)** 28:11,21
**certain (5)** 18:11 24:9 33:6 57:5 64:6
**certainly (5)** 65:15
**certainty (1)** 57:6
**certificate (2)** 72:13 77:14
**certificates (1)** 72:14
**Certified (1)** 77:16
**certify (1)** 77:16
**chain (1)** 51:10
**Chandeleur (6)** 4:8,21 23:19,24 24:6 48:11
**change (1)** 79:2
**channels (1)** 20:6
**character (2)** 7:5 50:13
**charge (11)** 1:10 7:18,21 34:12 48:4 49:21 54:16 57:15 63:20 74:6 77:7
**charged (14)** 3:1 5:13 21:9 49:11 53:18,22 54:2,6 54:20 56:8 57:14,18,19 64:16
**charges (8)** 5:12 7:16 54:10,15,16 57:4 61:12 72:22
**charts (1)** 2:17
**chase (7)** 4:15 27:24 34:2,3,5 48:6,7
**chased (2)** 3:20 27:21
**check (1)** 28:4
**checkmark (1)** 59:17
**choose (1)** 62:1
**Christine (1)** 70:19
**circling (2)** 8:22 19:22
**circumstances (5)** 51:11 53:15 55:16 62:24 63:21
**circumstantial (9)** 5:19 6:2,11 44:22,24 51:8,10 51:13 67:11
**citizen (5)** 10:12 41:20 55:20,22,22
**clear (5)** 11:4 46:11 65:8 73:15 74:1
**clearly (4)** 52:9 55:17 67:10,19
**Clematis (1)** 1:22
**clerk (1)** 74:6
**Clerk's (2)** 74:6 75:21
**client (1)** 63:10
**clips (1)** 9:1
**closely (1)** 34:9
**closing (7)** 1:10 2:8 65:6,16,18 67:3 77:3
**coast (49)** 3:4,16,21,22,23 4:7,12,15,20,21 8:21 9:17 10:18 11:15,18 13:4 14:5,10,11,12 17:8 17:25 19:13,23 20:1,8,9,14,21 24:22 25:8,8 28:18 32:21 34:2 37:5 45:1,6,8,9 46:5,8 47:3,4

47:5 48:6,7,10 65:1
**coconuts (1)** 16:13
**code (3)** 31:3,4 54:22
**coercion (2)** 41:22,25
**collective (1)** 60:23
**Collins (2)** 22:12,14
**come (22)** 2:25 3:7 5:14 8:5,12 10:12,17 12:8 15:4 15:6 16:24,21 31:8 30:14,15 48:17,18 54:17,24 55:9 63:7 66:12,13
**coming (7)** 2:2 7:10 11:7 54:25 55:13,17 68:14
**Commander (1)** 23:19
**comments (1)** 22:22
**commission (2)** 56:8,17
**commit (4)** 54:1,6 67:9,15
**committed (4)** 41:13 53:20,22 54:4,7 56:25 57:5 57:8 64:18 67:12,13
**common (10)** 7:3,8 15:5 36:22,23 45:12 46:12 48:20 50:11 51:6
**communicate (2)** 42:22 60:6
**complete (1)** 75:18
**complex (2)** 6:21 23:6
**complicated (1)** 22:1
**concerned (2)** 30:13 51:7
**concerning (6)** 50:8,25 51:3,20 52:13 53:11
**concluded (2)** 63:14 76:9
**conclusion (3)** 62:23 63:19,23
**conclusions (1)** 51:6
**conduct (6)** 10:6 56:3,13,18,19,21
**conference (1)** 63:20
**confidence (1)** 56:1
**confined (1)** 66:6
**connectivity (1)** 12:16
**consciously (1)** 55:16
**consider (13)** 44:9,9 50:1,18 51:14 52:23 53:10,14 53:20,23 54:3 62:25 69:12
**considerate (1)** 63:17
**consideration (5)** 7:4 50:11 58:25 63:8 65:7
**considered (3)** 34:15 57:16 58:1
**considering (1)** 51:5
**consistent (9)** 21:12 31:6 32:1,5,6 35:2 40:10,10 45:5
**consistently (1)** 30:25
**console (2)** 28:11,11
**conspiracy (5)** 54:11,12 47:21,24 48:4
**constant (1)** 29:18
**constrained (1)** 65:16
**contact (3)** 8:15 14:8 23:23
**contacts (1)** 23:22
**contained (1)** 72:22
**content (1)** 41:5
**controlling (1)** 51:21
**controls (2)** 27:14 50:23
**convict (1)** 6:24
**convicted (3)** 34:10 47:20 58:2
**convicting (1)** 35:10
**conviction (8)** 33:22,23 47:16 65:19 66:4,7,16,21
**convinced (4)** 50:16,17 55:3 59:3
**convincing (2)** 7:5 50:13
**cookie (1)** 15:21
**copies (4)** 60:19 61:3,12 75:8
**copy (5)** 54:12 60:18 61:4,10 75:18
**Corcoran (2)** 70:17,18
**correct (5)** 69:14,15,18 71:17 77:17
**counsel (10)** 2:14 21:23,23 40:17 62:20,20,21 67:3 67:20 68:5
**count (12)** 55:5 57:14 58:20 59:16,21,25 64:15 69:1,3,5,7,9
**country (4)** 6:24 29:12,14 30:20
**counts (20)** 6:18,19 7:16 21:14 34:13 47:23 48:24 54:11,16,20 59:22,22,24 60:5 61:6 69:11,21 71:13 72:20,22
**couple (3)** 14:17 33:2 71:22
**courage (1)** 55:25
**course (8)** 22:17 27:18 33:13 48:15 52:18 53:17 56:3 61:1
**court (19)** 1:1,22 2:1,2,5,14 10:3 12:2 16:14 21:16 21:19,21,22 27:12 31:13 36:7 37:7 41:8 47:11 49:1 53:5 66:7 72:6,20,24 61:6 69:11,21 73:1 75:2,3,13 77:22 80:2,3,23 68:25 70:2,7 71:10 72:19,21 73:7,21,24 74:17 74:19,20 75:6,9,15,23 76:8
**courthouse (6)** 36:19 36:3 67:24 68:5,7
**courtroom (27)** 2:3 26:5,12,13 35:18,23 62:4 68:10,15,22 70:3,11,13,15,17,19,21,23,25 71:2 71:4,6,8 72:18 73:6 74:4 75:5
**Court's (2)** 49:20 77:7
**cover (4)** 9:4 41:23 13:10
**covered (1)** 67:12
**cover-up (1)** 67:15
**co-counsel (1)** 44:23
**CPE (1)** 1:21
**craft (1)** 19:15
**credibility (2)** 18:9 44:10
**crime (19)** 7:18,19 12:20 49:11 54:6,23 55:2 56:8 56:17,22,24 57:1,11 64:9 9,12,12,13,15
**criminal (2)** 56:6 64:14
**criminally (1)** 56:20
**cross-examine (1)** 30:22
**cross-examined (1)** 31:16

**CRR (2)** 1:21 77:22
**Cruz (25)** 1:6 15:18 21:23 23:8 24:13 25:1,19 29:25 30:4 34:7,10,19 36:4,18 42:11,13 43:17 48:22 59:14 64:16,18 65:18 68:24 72:19 73:18
**Cruz's (4)** 23:24 24:7 25:2 65:22
**Cuba (61)** 3:4,12 5:8 9:18 10:7,18,19 12:10,21 13:4 14:5,8,13,15 15:12 16:6 18:4 19:1 20:15 20:22,24 21:4 24:18,22 25:8 26:14,16,18,20 27:1,6 28:22 29:10 30:4,12 31:2 32:6 33:3,7,10 33:12,14 36:14 37:17 38:21 39:17 41:13 42:6,8 42:23 43:2,19,22 45:6,8,22 64:25 65:1 67:5,17 74:16
**Cuban (21)** 2:24 3:14,15,16,21,22,23 9:24 10:16,23 14:12 27:21,23 28:6 30:16 33:8 38:24 38:25 39:7 41:11
**Cuba's (1)** 30:18
**cuddy (1)** 5:1
**custody (1)** 73:16
**customary (1)** 74:5
**cute (1)** 17:23
**cutter (10)** 4:7,18,20,21 11:18 15:21 32:21 46:21 48:11,11

---

**D**

**D (2)** 74:14 77:2
**damaged (2)** 42:21,25
**darkness (2)** 3:6 4:8
**data (3)** 12:14 13:3 64:25
**date (7)** 57:5,6,8,9 59:11 72:21,24
**dated (2)** 16:2 77:19
**day (8)** 2:17 12:14 24:25 28:19 37:13 40:6 46:11 77:19
**days (19)** 2:16,19 3:9 14:20 17:4,11,17,20,25 18:25 22:2,5 32:21 36:12 40:6,6 42:24 43:3 73:1
**De (29)** 1:6 15:18 21:23 23:7,24 24:6,12 25:1,2,19 29:25 30:3 34:7,10,19 36:4,18 42:11,13 43:17 48:22 59:14 64:15,18 65:18,21 68:24 72:19 73:18
**deal (3)** 60:4 66:22 74:1
**decently (1)** 5:1
**decide (3)** 49:9 51:16 53:12 58:24 60:25
**decided (1)** 63:10
**deciding (4)** 49:7 51:22 53:21 58:1
**decision (7)** 42:10,12 49:13 51:3,18 59:18 65:11
**decisions (1)** 53:14
**deck (1)** 28:15
**deduce (1)** 6:8
**deductions (1)** 51:5
**defendant (100)** 1:7,19 2:21,23 3:1,3,11,20 4:13 5:5,6,13 8:4,10,21 9:21,23 10:5 11:6 14:16 16:20,24 17:7 18:25 19:17,19 20:7,21 21:2,7,9 21:10 29:6 36:18 37:6,10,13,16,21 38:4,16,21 39:17 45:5,15,24 46:1,13,23 47:13 48:8,22 49:11,16,22,22,24,25 50:2,4,16 53:9,12,16,18 53:22 54:1,5,7,8,15,17,20 55:2,7,12 56:6,7,14 56:15,15,17,19,20,22,25 57:1,17,22,22 58:2 59:16,20 63:1,3,4,12,13 64:7,21 67:7 68:25 69:2,4,6,8 73:15,25,25 74:2
**defendants (1)** 6:24
**Defendant's (22)** 3:17 9:16 15:10 16:4,9,19 18:22 20:12,18 37:3,8 38:9 39:21 40:11,12,13,13 60:5,6,9 64:23 67:5
**defense (13)** 13:13 15:8 16:1 21:16 26:9 29:19,19 36:25 39:13 40:17 41:8 62:21 74:14
**defies (1)** 15:5
**definitely (1)** 67:14
**deleted (3)** 53:6,7 61:6
**deliberate (4)** 39:22 40:21 61:23 62:4
**deliberation (1)** 62:1
**deliberations (5)** 36:6 49:8 50:1 58:7 59:11
**deliver (4)** 43:7,11 74:7,8
**demonstrated (1)** 65:3
**denied (3)** 65:8 67:2,21
**depend (2)** 52:25 73:3
**depends (2)** 13:15 14:1
**depo (2)** 14:23 17:18
**deposed (1)** 17:4
**deposition (11)** 17:19 18:1,4 29:22 30:8,9,12 39:12 41:10,12,15
**depositions (8)** 10:15 13:14,16 15:9 32:25 35:3 37:9 39:22
**deputy (17)** 68:10,22 70:3,11,13,15,17,19,21,23 70:25 71:2,4,6,8 73:6 75:5
**derivation (1)** 26:16
**describe (1)** 13:18
**description (1)** 26:24
**desert (2)** 36:12 47:5
**deserted (3)** 36:15 40:7 46:17
**designed (1)** 3:19
**desire (1)** 60:6
**despite (1)** 26:11
**destination (3)** 5:6 9:10 21:4
**destroying (1)** 67:8
**detail (4)** 32:13 44:7,7 53:1
**detailed (3)** 39:20 40:1 9
**details (7)** 29:7 31:5 32:8 40:2,5,8 43:14
**detained (1)** 53:10

---

**determination (2)** 18:9 27:13
**determine (3)** 18:6 27:7,16
**determining (2)** 18:12 34:25
**devices (1)** 62:18
**Diana (9)** 9:6 10:25 15:24 19:18 27:4,7,17,22 39:5
**differ (2)** 19:5 52:10
**difference (6)** 26:20,21 37:14 44:23 48:5 60:4
**differences (1)** 47:18
**different (7)** 7:19 16:15 26:17,17 37:4 39:4 52:16
**differently (1)** 59:4
**difficult (1)** 23:6
**direct (8)** 5:18,20,25 6:11 44:24 51:8,8,13
**directed (2)** 56:14 57:1
**direction (2)** 56:10,12
**directly (3)** 4:6 52:9 66:22
**dirt (3)** 31:8,9 40:2
**disagrees (1)** 71:18
**disbelief (1)** 14:14
**disbelieve (1)** 51:18
**discuss (3)** 27:18 58:22 60:10
**discussing (1)** 59:1
**disprove (1)** 51:11
**dispute (2)** 51:12,20
**disregard (8)** 5:15 11:6 49:19 51:2 54:18,25 55:13 55:15
**distance (3)** 31:6,10 33:6
**distinction (2)** 6:10 51:12
**distress (2)** 20:3 46:3
**district (10)** 1:1,1,13 35:20,21 36:1 42:2,4 68:22 68:23
**divided (1)** 61:15
**document (1)** 39:7
**documents (3)** 38:24,25 61:22
**doing (11)** 3:1 4:14 9:19 11:9,14 12:4 13:8 16:22 21:3 35:11 66:1
**doubt (27)** 6:18,21,23 7:3,15,22 21:11 35:8,15 36:22 45:12 49:10 50:3,7,8,10,13,17 53:25 55:5,6 57:2,8 60:2 64:17 65:4
**driveway (1)** 6:7
**due (1)** 6:4
**due (2)** 65:14 73:19
**duty (3)** 49:6,9 58:22

---

**E**

**E (3)** 74:15 77:2,11
**earlier (3)** 10:25 50:18 65:1
**early (1)** 9:8
**echo (1)** 43:25
**effort (2)** 56:12 58:23
**either (7)** 10:14,15 13:16 16:16 51:13 57:1 69:25
**Elbow (1)** 35:9
**electronic (1)** 62:18
**elects (1)** 49:25
**element (7)** 7:23 8:1,3 10:8,9 11:5,5
**elements (5)** 7:23,25 8:2 55:4,6
**Elisse (1)** 71:8
**embolden (1)** 55:25
**embrace (2)** 6:17,20
**embraces (1)** 35:9
**emergency (1)** 20:6
**emphasize (1)** 58:13
**encourage (3)** 8:4 54:23 55:24
**encouraged (2)** 8:4,7 55:7
**encouraging (2)** 5:13 54:17
**ended (1)** 45:5
**enforcement (1)** 4:9
**engaged (1)** 56:19
**engine (4)** 4:17 24:17 48:9,14
**engines (5)** 4:3 9:8 19:11 28:12 48:12
**English (1)** 4:10
**enjoy (1)** 62:12
**enter (7)** 5:14 8:5 10:13 45:19,20 54:4 55:9
**entering (1)** 11:7
**enters (2)** 2:3 68:15
**entire (1)** 28:1
**entirely (1)** 67:3
**entitled (1)** 58:13
**entry (3)** 55:1,13,17
**enumerated (1)** 64:19
**envelope (1)** 72:1
**equipment (1)** 13:21
**equipped (1)** 47:6
**erasure (1)** 25:16
**essentially (1)** 6:19
**establish (1)** 56:25
**established (1)** 65:8
**evaluate (2)** 48:20,20
**evaluating (2)** 18:8 36:24
**evening (4)** 9:15,17 12:17 20:21
**event (2)** 73:10 74:10
**everybody (1)** 18:4 44:6 66:13 68:10
**Everybody's (1)** 44:5
**evidence (80)** 2:10,11 5:19,19,20,25 6:2,11,11 7:4 10:14 11:22,22 12:24,24 19:6 21:11,13 22:2 22:9,22 25:16 27:10 34:8 36:2,23 37:20 44:22 44:24,24 47:22 48:8,21 49:15 52:2,9 50:9,12,19 50:22,23 51:5,7,8,10,13,14 51:11,12,14 53:8,11,15,17,21,21,23 54:1,3,14 56:7 57:15

---

57:21 58:10,11,25 59:8 62:17,23 63:19,23 65:2 65:9 67:1,4,11,13,16,18
**exact (8)** 4:15 9:23 35:5,5 40:15 47:24 48:10 57:6
**exactly (13)** 3:1 5:22 8:10 12:16 14:8,16 30:10 32:19 37:6 45:3 66:11,17 67:1
**exclude (1)** 50:8
**excuse (5)** 11:25 20:13 26:1 53:3 68:21
**excused (3)** 58:18 61:23 69:14
**exhibit (7)** 15:7,15 26:9 27:25 34:9 39:11 41:1
**exhibits (9)** 50:20 62:1,15,16 74:1,1,3,8,14
**exited (1)** 12:19
**exits (2)** 62:4 72:18
**expect (1)** 68:4
**experience (4)** 10:5 11:21 12:22 65:24
**expert (2)** 12:12 45:17
**experts (1)** 2:17
**explain (7)** 6:2 7:2,24 18:5 49:17 54:9 58:21
**explained (1)** 5:22
**expresses (1)** 72:12
**eyewitness (2)** 5:24 51:10

---

**F**

**Fabelo (9)** 9:6 10:25 15:24 27:5,7,17,22 28:18 39:5
**facilities (2)** 74:5 75:1
**fact (21)** 5:15,16 10:10 11:6 17:22 25:17 30:7,10 34:19 35:19 37:5 51:9,11 52:14 53:1 54:18,25 55:13 57:17 60:18 63:12
**facts (20)** 6:8 13:11 22:13 27:9 34:24,24 35:1 36:2 39:4,19,20,23 40:9 49:10 51:4,11 55:16 59:7 60:22,25
**failed (2)** 52:15 64:16
**fails (1)** 50:3
**fair (2)** 43:21 64:8
**falsehood (1)** 52:24
**falsely (1)** 52:13
**familiar (1)** 29:9
**familiarity (1)** 4:14
**family (81)** 2:23 5:8 9:18 12:7 14:8,15,18 15:10 15:12 16:9,19,21,22,23 18:3,6,22 19:1 20:9,14 20:15 26:15,15 27:1 29:24 30:4,4 31:18,20 32:1 33:10,16 34:6,7,20,20 37:8,17 38:21 40:12,13,13 42:23 43:2 46:14,16,24 47:1,4 64:24 73:20
**fancy (1)** 14:6
**far (2)** 24:16,17
**fast (4)** 3:20 24:8,10 33:19
**father (6)** 3:13 12:9 13:21 14:24 17:3 32:1
**father's (1)** 14:18
**favorable (1)** 65:2
**fears (1)** 30:18
**February (1)** 9:23
**federal (4)** 42:2,4 54:23 64:13
**feed (1)** 4:24
**feel (3)** 13:10 22:7 65:16
**fellow (1)** 43:18
**felt (1)** 43:25
**fiction (1)** 13:12
**field (1)** 13:23
**figure (1)** 20:13
**filed (2)** 15:25 74:16
**Finally (1)** 34:6
**find (22)** 38:8 46:24 47:6 48:21,24 49:11 50:3 53:25 55:2,6 57:2,17 59:15,20 60:13 67:17 68:25 69:2,4,6,8 74:24
**finds (2)** 63:17 61:13
**fine (3)** 32:13 61:21 71:18
**finish (1)** 49:7
**first (30)** 4:22 5:18,21 8:1,3 10:8 11:16 15:1,3,20 18:15 19:7 21:24 23:23 24:20 26:18,22 27:7,17 27:20 29:2 35:19,21 37:2 41:6,7,9 44:2 59:9 65:20
**fit (1)** 22:12
**fits (1)** 22:16
**five (6)** 9:1 14:20 17:11 71:22,24 72:10
**five-minute (1)** 49:22 72:4
**FL (2)** 1:17,20
**Flagler (1)** 1:19
**flares (1)** 46:4
**flew (1)** 9:7
**Florida (11)** 1:1,7,23 4:6 13:7 35:20 42:2,5 47:3 68:23 75:21
**flow (2)** 29:18 64:7
**folks (2)** 28:2 60:25
**follow (3)** 49:6,17,18
**following (5)** 2:3 3:22 13:5 55:4 68:15
**food (2)** 4:24 9:14
**foregoing (1)** 77:16
**foreman (1)** 68:18
**foreperson (3)** 59:10,18 60:7
**forget (2)** 22:10 52:21
**form (3)** 59:12 60:18 61:11
**formal (2)** 49:21 54:15
**formation (1)** 32:19
**formula (1)** 6:22
**forthcoming (1)** 61:25
**forward (4)** 8:9,11 49:4 56:1

---

**found (20)** 12:12 29:8 34:14 37:23 38:6,14,15,17 38:18,19,22 39:1 41:15 43:9 44:17,25 45:21 46:2,20 72:20
**four (3)** 24:25 25:6 34:7
**fourth (1)** 2:16
**Francine (1)** 70:21
**Franklin (4)** 1:21 77:15,21,22
**Fred (1)** 70:15
**friend (3)** 14:18 18:3,25
**friends (3)** 16:21 29:24 34:20
**front (2)** 5:2 19:11
**full (3)** 9:1 17:21 58:25
**fumbling (1)** 9:2
**funny (1)** 61:16
**further (4)** 45:11 63:11,18 76:5
**F-1 (1)** 74:15

---

**G**

**G (1)** 1:19
**gadgetry (3)** 36:8 62:18 74:21
**Gartenmayer (2)** 70:15,16
**Gary (1)** 71:4
**gather (1)** 75:1
**Gelman (2)** 70:21,22
**gentlemen (50)** 2:6,15 5:10 9:16 11:21 12:5 15:4 18:21 20:24 21:6,24 34:18 35:7,17 36:11,17 37:8,14,20 38:5,19,23 39:6,15,21 40:9,15,25 41:6,13 44:1,10,12,15,21 45:2,7,23 46:1,23 47:1 49:1 70:3 71:19
**Gilligan's (3)** 36:11,17 48:19
**girl (1)** 32:3
**give (19)** 16:24 18:4 28:14 31:3 36:9 41:21,24 42:1 49:3 51:13 53:13 55:25 58:9 59:3 60:9 61:3,4,22 75:2
**giving (2)** 30:16 42:3
**glad (1)** 15:1
**go (48)** 4:10 6:3,6 7:11,13,17,23 9:3 10:3 12:2 13:2,15 18:13 22:18 22:19,21 24:16,16 27:15 28:22,25 31:2 40:6,21 43:22 45:10,10,11 45:15,18 47:18 49:3,4,7 58:18 59:9 61:10 62:7 62:15,17 67:5,24 71:23 72:8 73:13 75:11,17
**goes (4)** 4:3,20 66:25 67:14
**going (49)** 2:7 3:23 7:1,11 8:2,8 11:15 13:20,21 14:12,14 15:7,18 18:7,11 19:4 22:10 23:2,3,5 24:9,11,12 25:10 38:8,11,14 44:12,19,19,24 45:1,2,3,4 45:15,16,17,19,21 64:5 73:17
**gonna (2)** 24:16,16
**good (6)** 20:13,13 48:12,14 52:5 71:11
**gotta (1)** 36:20
**government (40)** 1:4,16 15:7,15,18 25:19,23 26:25 27:2,4,25 29:11,13,16,17 30:16,21 31:16 34:9,19 37:3 49:9,16 50:2 53:8 55:3 57:5,7 60:1 61:1 63:5,13,6 4 65:3,8,17 67:8,8 69:23 76:5
**Government's (5)** 29:12 39:10 41:1 50:5,8
**go-fast (8)** 3:18,19 4:3,22,23 9:5,25 27:22
**GPS (43)** 2:17 12:12,12,15,25 13:2,9,22 20:17,17 21:1 24:24,24,25 25:1,1,2,5,6,11,12,13,16,17 25:18,20 38:8,11,14 44:12,19,19,24 45:1,2,3,4 45:15,16,17,19,20 64:5
**great (4)** 35:23,24 46:17 53:11
**greater (1)** 58:14
**greatest (1)** 36:1
**group (2)** 32:3,5
**guard (39)** 3:4,16,21,22 4:7,12,15,20,21 8:21 9:17 10:18 11:15,18 14:10 17:8 18:1 19:13,23 20:1 20:8,9,14 27:21,23 28:6,18 32:21 34:2 37:5 45:1 46:5,9 47:3,4,5 48:6,7,10
**Guard's (1)** 5:23
**guess (6)** 44:21 45:14,20 48:8 72:15 74:23
**guilt (5)** 11:23 49:22 50:6,9 56:6
**guilty (23)** 11:13 34:14 48:24 49:11 50:2,4,16 55:2 57:17,17,22,22 58:17,17 59:19,19,21,21 65:10 69:1,3,5,7,9,12,15 71:13 72:20,21

---

**H**

**H (1)** 77:11
**hailed (2)** 4:10 5:24
**hand (5)** 3:5 68:18,19 72:11,25
**handed (1)** 13:22
**happen (1)** 25:21
**happened (9)** 19:18 20:16 30:3,10,24 35:3 37:18 40:10,18
**hate (1)** 65:15
**hay (2)** 34:19 37:5
**head (5)** 13:6 26:8,8,9 45:25
**headed (6)** 3:14 5:8 19:12 37:17 42:6,9
**heading (19)** 2:2 4:2,5 5:23 8:16,18,22 9:25 11:18 13:25 19:23,24 20:10,25 21:17 21:45:10,22 46:6 64:22
**heads (3)** 46:18,19,24
**headway (1)** 33:18
**hear (6)** 2:8 3:9 22:9 44:11 67:22 71:15
**heard (52)** 2:17,18,19 4:7,12,20 5:2,4,21 9:4,5,11 9:14,16,22 10:14,17 13:13,13 14:5 15:9,24 16:4,13 19:8 20:4,4 22:17,23,23 25:5,13,18

29:20,20 31:1 34:3 37:4,10,12 38:3,14 39:5,8
39:11 40:16 44:12,25 45:2,17 46:9 53:17
**hearing (3)** 58:3 71:11 73:19
**heavy (1)** 50:6
**held (2)** 56:20 73:19
**help (7)** 8:9 16:21 19:2 30:5 56:1 61:1 62:10
**helped (1)** 8:11
**helpful (1)** 2:12
**helping (4)** 2:25 3:7 8:12 21:8
**helpless (2)** 42:22 43:1
**hesitate (1)** 59:1
**hesitation (1)** 50:15
**hey (1)** 20:14
**hide (1)** 5:25:18
**high (4)** 10:20 21:7 35:15,15
**highlighted (1)** 47:19
**historic (1)** 35:23
**hit (1)** 13:6
**Hoflich (6)** 5:21 8:15 20:4 23:19 33:5 38:3
**hold (2)** 9:12 72:7
**holder (1)** 41:23
**holds (1)** 56:17
**home (1)** 72:15
**homemade (1)** 40:6
**Homer (1)** 70:11
**honestly-held (1)** 59:4
**Honor (21)** 10:1 11:25 27:9,11,16 36:10 47:12
53:3 64:13,20 65:13,15 66:10,15,20 69:16,19
70:1 73:18 76:6,7
**HONORABLE (1)** 1:12
**hopefully (2)** 23:2 61:25
**hour (5)** 24:1,2,10,12,15
**hours (9)** 14:16,17 17:5,6,7,14 36:15 40:8 46:16
**how'd (1)** 28:23
**huge (1)** 18:22 19:2
**hundred (2)** 23:23 63:25
**Hurtsbise (2)** 70:13,14
**Hyatt (5)** 69:14,16,19 70:25 71:1

**I**

**idea (4)** 13:20 14:3,9 45:4
**identical (2)** 15:14 44:1
**identification (6)** 10:23 38:24,25 39:7 41:21,24
**identified (1)** 39:16
**identify (10)** 26:3,11,12,23 29:5,5 37:6,9,11 39:10
**ignore (1)** 55:16
**illegal (1)** 11:14
**illegally (1)** 29:12
**illuminated (1)** 4:9
**illustrate (1)** 23:3
**immediately (2)** 15:17 48:17
**impartial (2)** 7:4 50:11
**imply (1)** 26:22
**important (12)** 7:6 30:1 34:25 36:4 44:7 50:15
51:17 52:13 53:1 64:5 76:1,1
**importantly (1)** 30:21
**impress (2)** 18:15 51:24
**impression (1)** 58:14
**impressive (1)** 66:8
**impropriety (1)** 67:19
**inaccurate (1)** 26:24
**inaccurately (1)** 52:22
**incident (1)** 35:4
**incite (2)** 55:24 56:4
**include (1)** 44:6
**includes (4)** 12:23 50:20 55:21 68:9
**including (1)** 53:15
**independent (1)** 58:10
**indicate (1)** 64:6
**indicating (1)** 55:17
**indication (1)** 15:18
**indictment (32)** 7:17,20 8:5 10:10 49:12,21 53:19
53:23 54:3,9,10,12,14 55:5,8,9 57:4,11,15
57:24 59:16 61:4,11,12 64:19 69:1,3,5,7,9
**individuals (2)** 10:22 60:4
**induce (2)** 54:23 56:2
**induced (4)** 8:4,7,9 55:8
**inducing (2)** 5:13 54:17
**influence (1)** 56:3
**influenced (3)** 43:19 49:15 58:11
**informed (1)** 5:11
**initial (1)** 8:24
**initially (1)** 4:13
**injustice (1)** 43:18
**innocence (1)** 49:20
**innocent (4)** 43:19,22 49:23 52:24
**inquiry (1)** 60:8
**insignia (1)** 28:6
**insignificant (2)** 34:24,24
**inspire (1)** 55:25
**instigate (1)** 55:24
**instruct (6)** 7:1 8:2,8 18:7 47:17 49:6
**instruction (3)** 35:14 53:3,7
**instructions (9)** 2:9 49:2,18,20 51:1 57:11 60:14
60:17 61:3
**intend (3)** 34:16,16 45:25
**intended (7)** 2:11 36:18 45:15 47:7,8 48:23 62:22

**intends (1)** 45:18
**intent (17)** 10:7 23:15 34:15 47:2,13,15,16,17,23
47:24 54:5 65:25 66:6,22 67:5,10,15
**intention (4)** 9:21 10:7 66:24,24
**intentional (1)** 52:24
**intentionally (1)** 57:12
**intercepted (2)** 28:17,19
**interdict (1)** 3:24
**interdicted (3)** 10:18,23 48:10
**interest (6)** 18:19,23 19:3,16 52:3 59:7
**interesting (2)** 14:21 32:9
**interestingly (2)** 27:25 45:4
**international (1)** 3:24 4:1
**interpretation (1)** 50:23
**interpreters (1)** 68:9
**interrupt (2)** 69:10 70:7
**interrupting (1)** 65:15
**investigation (2)** 73:4,12
**involved (2)** 56:8 61:7
**island (18)** 14:3,20,22 17:4,5,14 19:10,14 32:16
36:11,12,15,17 40:7 46:17 47:5 48:9 72:15
**issue (10)** 11:2 23:7,9,11,14 45:24 66:5,6 67:7,10
**issued (3)** 18:5 41:10,14
**issues (2)** 51:1 66:22
**items (2)** 64:12 69:14

**J**

**jail (2)** 42:2,4
**JAMES (1)** 1:12
**joining (1)** 56:16
**joint (1)** 56:12
**journey (2)** 5:1 9:13
**Joyce (5)** 62:7,11 72:11 75:1,23
**judge (19)** 1:13 5:11 7:1 8:1,1,8 18:7,11 19:4
21:18 24:10 33:21 35:14,21 47:17 58:3 65:24
73:6 74:14
**judges (2)** 59:6,7
**judgment (2)** 34:8 64:15
**July (1)** 1:18
**juncture (1)** 64:17
**JUNE (1)** 77:19
**juries (2)** 6:24 71:21
**juror (17)** 58:14 69:16,19 70:5,6,12,14,16,18,20
70:22,24 71:1,3,5,7,9
**jurors (2)** 58:12,22
**jury (50)** 1:10,11,11 2:3 5:12 7:18 8:3 27:12 28:3
40:21 49:5,8 53:10 54:12 57:20 58:1,16,19
59:1,9,13,15,20 62:4,17 63:1,7,9,17,19 65:9
67:12,17,23 68:2,15,25 69:2,4,6,8,18,25 70:4
72:3,16,18,20 77:7,9
**jury's (2)** 2:22 68:14
**justice (1)** 35:11

**K**

**keep (6)** 3:22 4:2 14:14 41:6 52:18 71:25
**keeping (1)** 63:8
**kept (1)** 30:21
**Key (2)** 1:7 73:2
**kind (2)** 32:9 34:4
**King (3)** 1:12 35:14,21
**knew (24)** 4:16 10:6 11:6,8,9,13,14,21 12:4,7,8,21
12:23 13:19 18:25 19:1,20 21:3 41:15 46:16
48:11,14 55:12 65:23
**know (77)** 2:16,20,21,23 3:11 4:5 8:14 9:4,20,20
15:13,14,22,23 16:10,16,18 17:9 18:4 19:17,19
19:22 20:20 22:14 24:8,24,24 25:5,6,10,17
28:22,25 29:4 31:17,18,20 32:22,23,25 33:6,13
33:14 35:16,19 37:21,22 38:18,19 39:6,9 40:23
42:14,16 45:14,15 46:12,20 47:13,22 60:23
61:9,17 63:25,25 74:22,22
**knowing (3)** 6:12 54:18,25
**knowingly (4)** 8:4 54:23 55:7 57:10
**knowledge (5)** 5:15 7:9 10:5 51:9 56:24
**knows (2)** 14:16 65:15
**know-how (1)** 10:5
**Kulbaba (2)** 71:8,9

**L**

**La (29)** 1:6 15:18 21:23 23:7,24 24:6,13 25:1,2,19
29:25 30:3 34:7,10,19 36:4,18 42:11,13 43:17
48:22 59:14 64:15,18 65:18,21 68:24 72:19
73:18
**lack (1)** 58:10
**ladies (36)** 2:15,5 10:9 16:11 20:12 15:4 18:21
20:24 21:6,24 34:18 35:7,17 36:11,17 37:8,14
37:19 38:4,18,22 39:6,15,21 40:8,15,25 41:6
41:13 44:1,10,12,14,21 45:1,7,23 46:1,13,25
47:9,23,25 48:4,8,19 49:1 70:3 71:19
**lapse (1)** 52:24
**large (1)** 41:23
**launched (1)** 4:21
**law (29)** 2:9 4:9 6:11,8,16 11:8,10 12:5 49:6,17
49:18,20,23,23 51:2,12 54:19,23 55:1,10,14,18
56:9,17 60:12,20 61:1 64:3,18
**LAWRENCE (1)** 1:12
**lawyer (1)** 64:1

**lawyers (9)** 2:7,9 50:21,24 60:10 61:8 62:15 63:16
66:13
**Lazaro (10)** 10:24 14:18 16:5 17:24 29:22 30:2
39:11 41:4,17,23
**lead (2)** 51:6 56:3
**learned (3)** 3:18 46:22 66:2
**leave (8)** 20:1 28:22 33:17 67:25 68:7 72:9 73:25
74:2
**leaving (1)** 34:3
**Ledwith (2)** 70:19,20
**left (13)** 5:7,7 12:22,13,16 15:16 17:11 19:11 27:6
32:6 38:11 42:6,8 47:11
**legal (5)** 5:18 6:14,23 29:15 63:18
**legalese (1)** 7:22
**legally (1)** 30:15
**length (1)** 54:11
**Leon (6)** 9:6 27:4,6,21 28:5 39:9
**letter (44)** 15:15 16:6,6,8,9,10,15,17 17:3,12,16
18:2,6 29:23 30:3,7,10,21,23 41:3,7,9,17,18,23
42:1,3,6,8,10,12,14,16,18,19,21,25 43:5,9,13
43:15,17,21 44:3
**letters (23)** 13:15,17 15:8,9,13,22,23 16:11,18
29:21,22 40:14,16,16,19,20,22,25 41:2,5,19
44:1,4
**let's (21)** 6:14 8:14 13:11 17:2 18:13 19:7 20:17
23:17 25:22,23 27:3 29:16 33:21 36:25 39:3
40:19,24 41:5,19 53:2 72:16
**lie (4)** 18:22 32:12,17 39:15
**lied (1)** 41:16
**lies (2)** 35:8,16
**lieutenant (4)** 5:21 8:15 20:4 38:3
**light (1)** 65:2
**lighting (1)** 46:9
**lights (12)** 3:7 4:9 8:18 11:12 17:9 19:25 20:1 46:3
46:8,8,10 64:21
**likes (1)** 72:2
**limit (1)** 12:24
**limited (1)** 53:24
**list (2)** 22:3 64:12
**listed (5)** 7:17,20 8:5 10:10 55:4
**listen (3)** 16:22 22:11 31:5
**listened (1)** 63:18
**listening (3)** 39:22,22
**lit (1)** 24:7
**little (19)** 4:14 5:1 14:21 17:2 22:19,21 23:16
25:20 26:18 31:5 32:2,8,13 34:24 35:1 40:10
40:23 71:21 72:12
**live (4)** 2:18 10:15 18:9 29:8
**lives (3)** 15:11 43:20,24
**Lizard (1)** 32:8
**located (2)** 23:25 24:1
**location (1)** 73:20
**long (7)** 5:1 9:13 12:16 14:25 17:17 24:6 62:1
**look (28)** 6:3 9:3 14:23 15:15 18:1 20:17 24:8,10
26:5 28:2,4 34:9,13 37:11 40:19,24 41:5,19
44:4,11 45:8 46:7,11,19 54:13 60:13,21 73:14
**looked (4)** 37:11 53:5 60:15 61:8
**looking (8)** 3:4 8:23 19:23 20:1,9 26:5 29:12
36:23
**lost (3)** 42:24 43:1,3
**lot (8)** 9:12 12:21 12:17 20:3,3,23 40:16 60:14
**loud (2)** 4:11 41:1
**Lounge (1)** 22:8
**lower (1)** 28:15
**lunch (2)** 61:24 62:24
**lying (4)** 18:13 19:21 32:13 39:14

**M**

**machine (1)** 36:8
**magical (2)** 28:9 46:15
**magically (4)** 36:16 38:21 45:20 46:15
**main (2)** 31:7 40:2
**mainland (2)** 33:3,14
**making (3)** 34:18 51:18 53:14
**man (9)** 13:22 26:9,12,23 39:9 41:7,8,10 43:19
**managed (1)** 48:18
**man's (1)** 34:15
**March (18)** 2:21 3:11 6:20 8:11 9:9 12:18 13:17
13:17 15:17 23:8,25 24:25 25:7 34:16 37:22
42:6,8 48:22
**Mark (2)** 1:17 12:20 46:19
**Mark (2)** 20:5 70:25
**marked (2)** 69:11,15
**mark's (1)** 61:5
**Marrero (9)** 9:6 27:4,6,21 28:1,5,15,17 39:9
**marshal (7)** 60:9 61:22 68:18 73:15,16 74:4 75:15
**Matanzas (11)** 3:12 19:12 21:4 24:14,21 25:13,14
25:17 33:3 45:6,16
**mathematical (1)** 6:22
**Mathijsen-Palay (2)** 71:6,7
**matter (10)** 51:20 58:2 61:2 64:3,18 65:13,17 67:5
73:11 77:18
**ma'am (1)** 63:8
**mean (18)** 7:8 8:7 24:9 26:21 32:12 51:15 52:19
60:23,24 75:6
**meaning (4)** 5:8 55:15,24 56:2 57:11
**meant (2)** 4:24 66:11
**Medina (15)** 10:24 16:5,5 17:24,24 29:23 30:2,6,7

30:8 39:11,11 41:4,17,23
**Medina's (2)** 14:18 30:6
**meet (1)** 71:24
**members (19)** 2:24 12:7 14:15 15:12 20:14,15
30:4,4 31:20 32:1 33:10 34:7,20 38:21 46:15
49:5 57:20 58:25 59:10
**memories (2)** 63:5
**memorized (1)** 40:17
**memory (5)** 27:13 52:5,24 58:8,14
**mentioned (1)** 73:8
**Mere (1)** 56:23
**Merit (2)** 54:14 57:3 59:5
**Merit (1)** 77:15
**message (1)** 20:6
**messages (1)** 20:3
**met (2)** 7:14,24
**Miami (13)** 1:17,20 5:8 12:18 25:3,3 35:21 45:4
45:22 73:2,19 74:24 75:21
**Michelle (1)** 71:2
**microphone (1)** 22:6
**middle (5)** 11:12 36:14 40:3 46:2 47:6
**migrants (8)** 4:16 8:12 9:24 14:6 20:19 48:2,3
66:25
**miles (11)** 14:4,11,12 23:21,22,23 24:2,9,12,15,16
**Milian (2)** 70:23,24
**mind (6)** 41:6 52:18 54:5 59:2 66:22 67:1
**minimize (1)** 44:17
**minute (3)** 11:4 40:4 47:11
**minutes (12)** 9:7 24:3,9,23 68:4 71:22,25 72:3,7
72:10,10 74:4 75:13
**miraculously (2)** 14:7 36:14
**mischaracterizing (1)** 27:10
**missed (1)** 15:2
**misspelled (1)** 16:1
**misstatement (1)** 52:22
**mistake (4)** 52:18 54:8 57:13 66:23
**mistrial (3)** 65:17 66:9 67:2
**modern (1)** 9:8
**moment (5)** 7:13 21:18 23:16 62:2 69:10
**Monday (2)** 73:13,22
**monitoring (1)** 20:5
**monotonous (1)** 69:21
**months (9)** 14:22 25:24,25,25,25 26:24 31:11 35:4
37:7
**morning (9)** 6:6 9:9 13:5 17:6 20:18,22 24:13,14
65:1
**mother (1)** 33:12
**motion (11)** 10:2 62:22 63:23 64:4,10,14 65:7,7
66:2 67:2,21
**motivation (1)** 39:20
**motive (3)** 29:11,11,15
**motives (2)** 39:15 56:4
**move (3)** 8:9 65:16 66:9
**moved (1)** 8:11
**moving (3)** 24:8,8 26:6
**muck (1)** 31:9
**mud (2)** 31:9 40:3
**multiple (1)** 5:24
**murdering (1)** 9:6

**N**

**N (1)** 77:2
**name (8)** 11:2 15:25 16:1,14,16 31:4 41:9 44:2
**named (1)** 55:8
**names (7)** 9:7 15:23 22:3,4,20 59:25 70:8
**national (3)** 10:11 55:20,21
**nationals (4)** 2:24 3:14 10:16,19
**naturally (1)** 52:20
**natural-born (1)** 55:19
**nature (1)** 33:13
**navigate (1)** 12:21
**navigated (1)** 12:18
**navigational (1)** 13:21
**near (1)** 57:9
**nearly (1)** 15:14
**necessarily (1)** 52:19
**necessary (5)** 49:11 50:6 54:6 56:21 74:10
**need (6)** 7:21 13:10 21:2 52:23 61:1 71:23
**needs (1)** 75:7
**neighbors (1)** 6:5
**neither (1)** 58:11
**nephew (1)** 18:24
**never (9)** 19:9,13 36:3 42:10,13 43:19 44:3 57:25
58:20
**new (1)** 74:21
**nice (1)** 25:20
**niece (3)** 3:13 12:9 14:25
**night (17)** 3:6 4:4 6:9 10:23 11:13,13 14:1,21
17:14,19,21 22:15 24:15 28:18 31:7 40:8 46:3
**nights (3)** 14:1 40:8,8
**nighttime (2)** 6:3 20:20
**noon (1)** 68:7
**north (7)** 13:6 19:23,24 24:1,21,22 45:10
**northbound (7)** 2:22 4:5 5:23 8:16,18 20:25 64:22
**Northeast (1)** 1:17
**note (3)** 57:4 60:7 61:14
**notes (6)** 44:12 58:5,6,9,11,13
**notetaking (1)** 58:4

**notice (2)** 4:22 29:3
**Noticing (1)** 6:11
**number (15)** 4:25 9:12 11:11 18:11 22:2 24:9 28:12 36:1 41:21,24 44:17 51:19 53:7 68:23 70:5
**numbers (2)** 67:25,25
**numerically (1)** 61:15
**numerous (1)** 65:18
**nutshell (1)** 34:18

**O**

**object (1)** 12:1
**objection (4)** 10:1 27:9 69:13,20
**observe (1)** 52:7
**obviously (1)** 47:5
**occasions (2)** 53:20 54:4
**ocean (3)** 2:22 17:14 47:7
**offend (1)** 72:9
**offense (5)** 57:4,7,8,14,19
**offenses (4)** 54:10 57:18,23 64:19
**offered (1)** 74:7
**offers (1)** 53:8
**office (4)** 73:11 74:7 75:21,21
**officer (17)** 26:10,14 37:4,6,15,15,23 38:3,8,13,14 38:25 39:1 63:5 73:5,5,10
**officers (2)** 39:8 45:1
**Official (1)** 1:22
**offshore (1)** 33:6
**oh (3)** 26:10 46:10 61:13
**okay (4)** 15:1 49:5 53:6 58:4
**onboard (18)** 19:10 38:7,11,15,15,17,18,19,22 39:1,6,9,12 40:4 44:25 45:21 46:4 48:5
**once (1)** 10:17
**one's (1)** 56:10
**open (1)** 69:13
**opening (2)** 35:17 36:3
**operating (3)** 3:6 4:8 34:1
**operational (2)** 11:12 19:25
**opinion (2)** 50:25 59:2
**opportunity (1)** 52:6
**opposing (1)** 36:9
**order (2)** 21:22:24
**ordered (2)** 61:24 62:10
**ordinarily (1)** 56:9
**organized (1)** 56:9
**Orihuela (6)** 30:11 31:17 32:4 37:12 41:2,20
**outcome (4)** 18:20,23 19:3 52:4
**outfits (1)** 46:18
**outfitted (4)** 4:23 5:2 9:11,12
**outrun (4)** 4:17 48:13,13,15
**outside (1)** 3:21
**overboard (2)** 38:9,11
**overcrowded (1)** 11:12
**Overruled (2)** 10:3 12:2
**owes (1)** 55:22
**o'clock (9)** 4:6 11:13 24:13,14,15 63:1,7 68:5,6

**P**

**pad (2)** 60:8,8
**Padilla (16)** 5:4 9:15 20:5 25:23,24 26:2,10,14 37:5,6,16,23,23 38:8,25 45:5
**Padilla's (2)** 37:15 38:13
**page (1)** 53:6
**Palm (1)** 1:23
**paper (1)** 61:5
**paperwork (1)** 61:9
**part (6)** 51:19 63:14 67:15 74:16,19 75:25
**participant (1)** 57:3
**participate (1)** 56:23
**particular (4)** 18:17 51:20 52:1 73:3
**particularly (1)** 28:6
**parties (1)** 2:7
**parts (2)** 8:24 11:16
**party (1)** 11:17
**passengers (2)** 9:5,13
**patrol (2)** 48:13
**pause (1)** 31:20
**people (33)** 3:4,7 4:25 5:2 6:19 8:23 9:21 10:9 11:4 15:23 16:11 19:8 20:11 21:8 23:9,10 24:13 26:19 28:12 29:3 32:20 33:17 34:2 35:20 43:3 47:2,6,8 48:1,5 52:20 59:25
**perfectly (1)** 63:22
**permanent (1)** 55:23
**permission (2)** 10:12 12:8
**person (16)** 14:2 18:10 26:10,25 33:25 34:1 55:8 55:11,19,22 56:9,11,12,16,16,18
**personal (2)** 18:19 52:3
**personally (2)** 56:7,19
**persons (3)** 8:4 11:7 56:12
**person's (2)** 55:13,17
**persuasion (1)** 56:4
**pertaining (1)** 57:16
**Phil (2)** 22:12,14
**phone (27)** 11:19,19,20 17:6 20:7,8 33:1,9,14 37:24,24,25 38:1,4,6,6,10,10,15,17 46:4 65:22 66:3,11,16,21,24
**phones (2)** 11:22 14:6
**phrases (1)** 26:18

**pick (10)** 9:18 20:9 23:22 24:20 26:15,15 27:1 33:16 37:17 64:25
**picked (9)** 5:8 12:10 20:15 21:5 24:13 26:19 31:4 39:17 43:5
**picture (2)** 8:20 28:3
**pictures (1)** 48:9
**piece (1)** 61:5
**place (3)** 24:13 35:23,24
**please (5)** 2:14 21:21 62:7 71:23 72:8
**plenty (4)** 4:23,24 9:13,14
**point (9)** 4:2 5:7 12:19 28:20 32:23 45:8 63:2 67:14 76:4
**points (3)** 23:3 24:25 25:6
**polled (1)** 69:25
**poly-foam (1)** 13:19
**position (1)** 13:6
**possibility (1)** 63:2
**possible (7)** 6:22 11:24 12:25 20:3 48:21 50:7 71:10
**potential (1)** 39:14
**practice (1)** 74:5
**precedence (1)** 58:9
**prejudice (1)** 49:15
**preparation (1)** 73:11
**prepared (1)** 59:12
**presence (1)** 56:23
**present (2)** 53:23 73:5
**presented (5)** 39:20,22 40:17 49:14 75:11
**presentence (2)** 73:4,12
**preside (1)** 59:11
**presided (1)** 35:22
**pressing (1)** 71:23
**presumed (1)** 49:23
**pretty (5)** 4:17,25 11:4 16:18 22:12
**prevail (1)** 56:4
**previous (4)** 11:21 65:24 66:16,21
**principle (2)** 5:18 6:14
**principles (1)** 5:18
**printed (1)** 60:17
**prior (8)** 33:22,22 47:16,20,25 65:19 66:4,7
**probably (2)** 61:21 73:2
**probation (5)** 63:5 73:5,5,10,11
**problems (1)** 49:24
**procedure (2)** 64:14 72:1
**proceedings (6)** 1:11 2:4 21:20 68:16 76:9 77:17
**produce (1)** 49:24
**profusely (2)** 43:24 44:6
**programmed (3)** 25:11,11,12
**promise (1)** 71:25
**promised (1)** 71:20
**proof (12)** 6:15 7:5 16:25 35:12,12,12 47:16 50:5 50:8,12,13 51:10
**proper (1)** 64:8
**protect (2)** 16:23 64:7
**prove (9)** 6:17 7:22 49:24 51:11 52:13 57:6 64:17 67:8,16
**proved (8)** 7:14 50:7,16 56:7
**proven (2)** 49:10 55:3
**proves (2)** 21:11 57:7
**provided (1)** 39:14
**proving (2)** 50:2 60:2
**publish (2)** 68:20,21
**puddles (2)** 6:7,12
**pulled (4)** 4:8 8:16,17 53:4
**punishment (2)** 57:25 58:2
**purport (1)** 16:11
**purpose (2)** 5:5 66:9
**purposes (2)** 23:21 53:24
**pursuant (2)** 64:13 75:9
**put (10)** 4:8 10:22 16:2,19,25 22:25 26:17 41:2 59:17 75:3
**p.m (2)** 23:24 68:12

**Q**

**question (14)** 5:5 18:15 19:4 23:7 30:22,22,23 57:25 60:8,12,20,22,24 61:19
**questions (8)** 17:23 18:11,14 51:23 52:8 61:21 68:3 72:1
**quickly (3)** 4:17 47:18 68:1
**quite (1)** 71:15
**quote-unquote (1)** 17:12

**R**

**radar (5)** 8:15 23:20,20,22,23
**radio (1)** 4:11
**raft (13)** 13:18 27:20 31:2,10,10,15,24 32:5,6,9 40:6 42:21,25
**raincloud (1)** 6:4
**raining (2)** 6:8,9
**rainy (1)** 31:7
**raise (1)** 55:25
**randomly (2)** 36:13 46:23
**reach (7)** 33:3,11 36:14 51:6 58:16,20,23
**reached (2)** 31:14 68:1
**read (10)** 23:2 29:22 35:14 40:23,25 54:11 60:14 70:4,8 71:12
**reading (2)** 69:12,21
**reads (1)** 59:13

**ready (1)** 46:18
**real (5)** 7:13 32:13 50:10 59:6
**realized (2)** 31:16 50:12
**really (7)** 5:17 13:21 34:9 35:24 40:20 46:25 62:9
**Realtime (1)** 77:16
**reason (9)** 7:3 18:17,22 26:17 35:16 50:10 51:6 52:1 61:14
**reasonable (27)** 6:18,21 7:15,22 15:5 21:11 35:7 35:15 36:22 45:12 49:10 50:3,8,10,12,17 53:25 55:5,6 57:2,8 60:2 63:22 64:8,17 65:4 67:18
**reasonableness (1)** 7:9
**reasonably (1)** 57:9
**reasoning (1)** 56:4
**reassemble (2)** 68:1,2
**rebuttal (4)** 36:9 63:4,14 66:5
**recall (4)** 21:1 27:19,19 62:25
**reception (1)** 37:25
**recess (5)** 49:2 67:22 68:7,10
**reckless (6)** 5:15 11:6 54:18,25 55:12,15
**recognizes (1)** 56:9
**recollection (3)** 30:24 50:22 58:10
**record (12)** 50:21 67:4,17,19 74:17,19 75:7,10,12 75:19 76:1 77:17
**recorded (1)** 75:25
**records (1)** 12:16
**recovered (2)** 11:19 39:7
**recruit (1)** 20:14
**reevaluate (1)** 68:6
**reexamine (1)** 99:2
**refer (1)** 73:10
**reference (8)** 54:12 65:19,20,23 66:3,10,15,20
**references (3)** 65:18 66:4,7
**referred (1)** 6:1
**reflect (1)** 75:7
**refused (2)** 18:4 41:10
**Registered (1)** 77:15
**regular (3)** 14:6,7 38:20
**relationship (2)** 31:19,20
**relatives (2)** 42:23 43:2
**relies (2)** 23:21,21
**rely (5)** 7:6 26:25 50:14 60:23 64:20
**relying (1)** 37:19
**remain (3)** 68:5 72:6 75:13
**remains (1)** 30:7
**remanded (1)** 73:16
**remarks (2)** 67:3,20
**remember (36)** 12:13 14:21 22:3,4,16 26:3,4,4,7 26:11 27:3 28:5,21,23,24 29:4,4,18,25 31:25 32:20 35:3 37:9 39:20,21,24 40:1,4,5,7,9 43:14 43:16 50:21 52:21 59:6
**remembers (2)** 26:8 52:20
**remembered (2)** 54:13 62:20
**reminded (1)** 22:8
**Rene (1)** 71:2
**renew (2)** 62:22 64:14
**Renewed (1)** 77:8
**Reniel (1)** 17:11
**report (2)** 73:4,12
**reporter (8)** 1:21,22 16:15 31:14 68:10 75:9 77:15 77:16
**requested (1)** 73:18
**require (1)** 49:23
**required (1)** 50:7
**rescinded (1)** 41:16
**rescue (8)** 3:13 32:14 17 36:16 45:25 46:1 47:1 48:18
**rescued (2)** 34:7 37:13
**Reserve (1)** 10:1
**reserved (1)** 66:2
**reside (3)** 5:14 8:5 54:24
**residence (1)** 55:1
**respect (18)** 7:24 22:8,23 23:11,13,15,18 30:1 34:5,15 36:6 65:14,17,21,25 66:7,16 67:4
**respectfully (1)** 64:14
**responsible (2)** 56:18,21
**rest (2)** 21:16 63:13
**rested (1)** 63:12
**resting (1)** 63:12
**rests (1)** 61:5
**reviewed (1)** 69:11
**Ricardo (5)** 14:9 15:5 20:5 25:23 37:4
**right (46)** 7:2 12:5 13:4,5 16:24 21:16 24:7 24:3 24:20 28:9 29:16 31:18 35:4,8,11,16 36:7 37:11,24 40:24 41:9 44:2 49:5 60:6 61:22 63:20 65:1,5,12 67:22 68:8,11,20 70:2 71:10 71:19 72:19 75:5 76:3,8
**River (2)** 12:18 25:3
**RMR (2)** 1:21 77:22
**road (4)** 31:7,8 40:2,2
**rock (1)** 32:19
**rocks (1)** 32:16
**Rogers (3)** 70:6,11,12
**Romo (2)** 71:2,3
**room (12)** 7:18 8:3 28:4 40:21 49:8 54:13 58:16 58:19 59:9,13 62:17 72:16
**round (2)** 24:18,19
**route (3)** 21:3 25:12,14
**routes (4)** 21:2,3 45:16,18
**rubber (4)** 32:11,12,15 40:4

**Rule (7)** 1:10 62:22 63:18,22 64:13 65:4 77:8
**rules (3)** 49:6 64:3,13
**ruling (1)** 65:7
**run (1)** 62:18
**running (7)** 3:6 8:17,18 11:11 19:25 46:10 64:21
**run-in (1)** 4:15
**rustic (4)** 17:16,17,18 19:15

**S**

**S (1)** 77:11
**safekeeping (1)** 74:9
**Sal (16)** 14:4 17:20 20:22,24 24:1,21,22 25:9 32:18,23,24 42:18,19 45:9,11 46:21
**sanctioned (2)** 43:8,12
**Sandra (1)** 70:13
**sandwiches (2)** 62:10,12
**sat (3)** 26:4,4 37:24
**satellite (21)** 11:19,19,20,22 14:6 20:7 37:24,25 38:1,4,6,6,10,15,16 46:4 65:22 66:3,11,16,21
**saved (5)** 15:19 17:12 21:1 43:20,24
**saw (20)** 4:12,19 5:22,22,23 8:15,17,18,23,24 9:1 10:24,24 11:16 19:24 20:7 27:23 38:3 48:9
**saying (2)** 51:14 67:9
**says (13)** 14:19 15:1,19 22:14 26:6,10,18,19,19 34:13 37:24 67:7,8
**scene (1)** 56:23
**schedule (1)** 73:14
**scheduled (2)** 72:24 73:12
**schedules (1)** 72:25
**Schwartz (18)** 1:16 2:13,14 10:4 12:3 12:21 13:20 35:9 44:23 64:20 65:16,16 66:10,15,20 69:24 75:16 76:5 77:4
**screen (3)** 10:22 18:10 22:25
**sea (2)** 14:1 46:24
**seas (3)** 10:20 21:7 38:1
**seat (1)** 66:18
**seated (3)** 2:5 66:13 68:17
**second (22)** 10:9 12:3 36:19,21,22 49:12 53:19 54:2,9,21 55:8 57:11,23 61:4,11 64:19 65:21 69:1,3,5,7,9
**section (3)** 54:22 75:4,20
**see (31)** 2:11 6:7 8:19,20,20 15:7,16 22:20 24:7,10 26:7 28:6,8,9,10,21 31:21,24 33:19 34:4 36:3 38:5,5,16 41:1 46:8 52:3 60:13 61:5 68:6 74:21
**seeing (1)** 28:16
**seek (1)** 59:7
**seen (6)** 2:17,18 14:24 35:18 36:1 40:20
**select (1)** 59:10
**selected (1)** 5:12
**self (1)** 56:10
**send (4)** 60:10 61:14,20 62:17
**sense (17)** 3:5 7:3,9 15:5 30:3 36:22,23 45:12,12 45:13 46:12,25 47:9 48:20 50:11 51:6 64:8
**sensible (1)** 74:20
**sent (4)** 10:18,19 15:8 40:17
**sentenced (2)** 43:18,21
**sentencing (3)** 72:24 73:13,19
**separate (6)** 7:18,18 54:10,21 57:14 74:18
**separately (2)** 55:4 57:16
**serves (1)** 29:13
**sets (1)** 23:3
**seven (1)** 17:25
**shadow (1)** 6:23
**shape (1)** 46:17
**shaved (3)** 26:7,8,9
**ship (1)** 3:24
**short (2)** 30:20 61:19
**shoulders (2)** 6:16,16
**show (7)** 7:14 10:4 11:22 40:22 41:10,14 67:11
**showed (4)** 17:7 21:4 33:15 41:12
**showing (4)** 25:1,13 64:25 65:25
**shown (1)** 16:6
**shows (5)** 10:4,7,7 13:3 20:18
**side (3)** 35:20 65:23 74:7
**sight (1)** 6:4
**sign (1)** 59:11
**signals (1)** 46:3
**signed (1)** 72:13
**significance (1)** 52:25
**significant (1)** 64:5
**similar (2)** 53:18 54:3
**similarities (1)** 44:5
**simple (5)** 21:6 21:6 52:18,23 61:20
**simplify (1)** 59:24
**simply (2)** 52:23 62:15
**sincere (1)** 43:15
**sing (2)** 22:10
**singing (1)** 22:7
**single (1)** 49:19
**sir (13)** 21:17,22 62:7,8,19 64:11 69:22,24 73:23 74:13 75:14,22 76:2
**sister-in-law (8)** 3:13 12:9 14:19,25 17:15 33:11 33:11 37:10
**sit (2)** 20:12 63:17
**situation (1)** 68:6
**Sivashree (1)** 1:16
**six (7)** 9:2 14:20 17:17 23:21 34:14 40:6,8

sleep (1) 6:6
sloved (1) 4:19
small (1) 40:23
smuggle (5) 34:12,16 47:15,21,24
smuggler (1) 48:2
smugglers (1) 48:1
smuggling (8) 3:19 4:23 5:3 9:12 13:8 20:11 23:12 66:25
solely (1) 6:16
somebody (3) 32:20 44:16 45:20
Somellian (2) 71:4,5
someone's (1) 18:13
son (1) 18:24
song (3) 22:8,12,14
soon (1) 36:7
sorry (2) 11:25 14:19
sort (2) 12:14 60:16
sound (1) 71:10
south (6) 4:6 13:6 20:22 25:3 45:10,11
Southern (6) 1:1 35:20 42:2,4 68:23 72:2
spaces (2) 59:17,19
Spanish (1) 4:10
speak (2) 2:7 42:13
speaker (1) 4:11
speaking (2) 16:8 66:14
specific (3) 40:1 49:10 57:23
specifically (1) 7:1
spectator (1) 57:3
speed (1) 3:19
spell (5) 16:14,16 31:13 41:9 44:2
spelled (2) 16:13,15
spelling (2) 11:2,3
spent (3) 14:21 28:1 32:20
spoke (2) 40:12 42:11
spotlight (3) 4:9 8:21 46:8
spotted (1) 3:16
sprinkler (1) 6:5
squarely (1) 67:10
stand (4) 10:15 22:5,6 39:23
standard (3) 5:5 6:23 65:4
standing (3) 28:11
start (3) 8:14 19:7 66:19
started (2) 32:9 45:4
state (3) 54:5 66:22,25
stated (1) 50:18
statement (12) 26:13 27:1 41:21,24 43:13,15 53:9 53:11,13,15 54:14 64:23
statements (1) 35:1
States (81) 1:1,3,13 2:23,25 3:8,15 4:2,5 5:9,14 6:16 8:6,12,16,22,25 9:10,19,22,25 10:12,13 10:17 11:7 12:8 14:11 15:2,12,17,19,21 16:3 19:12,24 20:10,11,16,25 21:8,9 30:14,15,18 33:14 36:19,20 37:18 41:14,16 42:2,4,7,9 43:6 43:10 44:8 45:23,25 46:6 47:8,14,15 48:23 54:18,22,24 55:9,14,18,20,21,23 59:14 60:3 64:23,24 67:6 68:22,24 73:16
station (1) 31:3
status (1) 39:15
stay (2) 68:8 72:9
Stephen (3) 1:21 77:15,22
Stewart (1) 1:19
stop (7) 3:23 4:10,10,13 5:24 12:5 48:16
stopped (8) 4:19 10:20 17:8 19:13 24:6,15 31:8 42:22
stops (1) 4:18
stories (1) 37:4
story (17) 5:7 13:13 14:15,18 15:4 16:25 17:21 20:13 31:23 34:21,23 40:18,18 48:17,18 61:16 71:21
straight (2) 13:6 17:22
straightened (1) 30:8
stranded (9) 14:3 15:19 17:4 19:9 20:23 36:12 40:7 46:17 47:5
stranding (1) 19:14
strange (2) 13:22 37:11
Street (3) 1:17,19,22
strict (1) 50:5
stuff (2) 22:25 27:3
Suarez (17) 1:6 15:18 23:8 25:2,19 29:25 34:7,10 36:4,18 42:11 43:17 48:22 59:14 64:16 68:24 72:19
Suarez's (2) 34:19 65:19
submit (1) 18:21
subpoena (1) 29:13
subpoenaed (1) 19:18
substantial (1) 67:14
sufficient (2) 56:25 57:7
sufficiently (1) 65:9
suggest (4) 28:14 32:4 34:21 51:23
suggested (1) 39:13
suggests (1) 25:19
Suite (1) 1:22
summarize (1) 59:24
summary (1) 54:16
Sundaram (7) 1:16 27:9 36:8,10 47:12 66:5 77:6
superseding (17) 49:12 53:19 54:2,9 55:9 57:11 57:15,24 59:16 61:4,12 64:19 69:1,3,5,7,9
supervisor (2) 74:24 75:3
supposed (3) 16:23 18:8 33:16

supposedly (2) 41:7 46:20
sure (14) 2:12 11:3 13:5 19:1 30:5 32:19 37:10 44:6 47:1 62:10,16,21 71:11 75:17
survive (1) 65:4
suspending (1) 14:14
sustain (1) 65:10
sympathy (1) 49:15
system (3) 6:5,6 71:10
Szoboszlay (4) 20:5 38:3,14 39:1
s/Stephen (1) 77:21

**T**

T (1) 77:11
take (39) 4:25 7:13 9:18 15:2,15,20 22:24 23:1 30:16 36:20,20 40:24 43:6,10,12 44:4,8 45:8 46:7,11 49:2 58:4 60:13,21 62:11,12 65:6 66:12 71:21,22 72:7,16 73:22,24 74:6,21 75:3 75:6,20
taken (4) 1:11 58:12 68:12 75:9
takes (2) 32:22 73:4
talk (14) 5:17 6:14 13:11 17:22,22 23:15 25:22 25:23 27:3 29:16 33:23 36:25 39:3 40:16
talked (13) 12:13,14 13:11 32:11,11,15,16,22 33:20 37:1,4 39:19,25
talking (3) 60:15 61:18 72:4
team (1) 4:21
telephone (1) 25:20
tell (20) 14:8 18:12,18 22:13,15,15 24:9 26:14 29:9 30:25 32:12 33:21 34:21 44:20 52:1 61:13 61:15,16 71:25 76:1
telling (5) 18:13,16 39:18 51:24 52:19
tells (3) 26:2 27:6,7
ten (1) 68:4
tend (1) 52:21
tending (3) 51:11 52:12 67:11
term (3) 50:19 55:21 57:10
territorial (2) 3:16,21
testified (6) 11:1 25:24 33:5 41:8 52:7,13
testify (5) 10:25 38:4 49:25 63:3,10
testifying (1) 51:20
testimonial (1) 63:14
testimony (34) 2:18 5:25 17:13 18:8 19:5,6 20:23 22:17 23:17 27:11 28:21 31:25 33:8 34:3 36:24 37:15 38:13 42:1,3 48:20 49:14 50:20 51:8,17 52:10,11,16 53:2,8 58:15 63:11 64:22 74:16,18
thank (22) 2:5 11:25,24 27:16 36:6,10 43:20,23 47:12 48:25 62:3,8,8,14 64:11 68:13,17,19 71:19 72:17 76:6,8
thanking (1) 44:5
thanks (2) 71:24 72:12
they'd (3) 32:17 35:5 40:15
thing (11) 4:22 9:24 12:11 15:1,20 23:2 26:19 27:7,17 34:10 59:9
things (11) 2:19 7:10,21 28:20 36:25 52:7,21,21 71:22 72:8 74:22
this (15) 3:23,25 5:6 15:16 17:16,20 21:25 35:20 45:9 57:3 59:4 60:21 61:20 62:10 73:21
thinks (1) 16:7
Thomesha (1) 70:23
thousands (1) 60:16
threat (1) 41:22
threats (1) 41:25
three (6) 2:16,19 3:9 7:21 55:12 66:4
three-hour (1) 34:3
Three-plus-hour (1) 48:7
threw (1) 11:20
throw (2) 65:22 66:23
tie (1) 22:8
tied (1) 63:9
tighter (1) 34:23
time (31) 3:12 9:24 13:1,3,9 14:25 16:3 17:17 21:25 22:6 24:19,20 26:2 30:20 33:15 38:9,11 47:11 48:11,12,14,18 52:14 58:6,6 60:7 61:23 66:13 73:3,4,17
timely (2) 64:4,4
times (3) 5:24 60:16,16
told (35) 8:15 9:7,17 15:20 19:9,18,20 20:14 28:17,18,23 29:2,2 30:2,8,8,9,13,20 31:1 34:22 35:17 36:2 37:16,19 39:1 40:11 43:5,9 44:7,13 44:23 45:3,17 58:4
tomorrow (1) 73:3
top (11) 41:3,20 42:1,6,10,14,18,21 43:5,13,17
toss (2) 38:9,11
tossed (1) 25:19
touch (1) 43:1
town (2) 29:8 74:24
track (2) 24:25 44:18
tracking (2) 12:14 13:3
tracks (4) 11:23 13:10 45:2,3
tradition (1) 74:11
transcript (5) 1:10 14:23 74:18 75:18 77:17
transcripts (4) 74:15 75:2,8,16
transportation (1) 74:9
traveled (1) 25:3
traveling (1) 24:2
trial (12) 1:11 2:17 3:10 18:8 22:18 49:14 51:3 52:17 53:17 54:8 57:22 75:11
trip (13) 5:21 24:24 19 28:1,23 29:10 31:1 42:10

42:12,15,17 43:20,23
trips (1) 34:18
trouble (4) 11:15 16:20 18:24 36:21
truck (7) 31:4,6,7,9,21,22 40:3
true (2) 39:16 51:15
trust (1) 14:14
truth (8) 18:13,16,18 39:18 51:25 52:2,20 59:7
truthful (2) 43:13,16
try (1) 22:10
trying (5) 11:23 12:24 30:22 46:19 63:16
turn (7) 12:23 13:23 15:3 16:20 44:8 47:2 75:19
turned (7) 12:17,20 13:4,7 16:21 25:5 44:16
turns (1) 13:1
Twenty-four (1) 26:1
twice (2) 25:6 29:12
two (40) 5:19 9:4,8 14:1,5 15:23 16:10 19:11 23:20 25:24,25 26:18,24 34:1 37:7 39:8,14 40:6,8,22,24 41:2 44:25 48:1,1,5,12 53:13 54:6 55:11 58:18 59:17,18 60:19 61:3,12 62:6,6,7,8
types (1) 5:19

**U**

unanimous (3) 58:17 59:18 69:17
unanimously (7) 59:15,20 68:25 69:2,4,6,8
unauthorized (1) 67:6
uncle (6) 3:13 12:9 14:17,25 17:11 32:2
understand (1) 52:8
understandable (1) 63:22
understanding (3) 71:15,16 75:10
undocumented (1) 67:6
unduly (2) 58:11 68:2
unflappable (1) 30:23
uniforms (1) 28:7
unimportant (1) 53:1
uninhabited (1) 36:14
unit (23) 12:12,17,25 13:1,3,9 20:17,17 21:1,2 25:2 38:8 44:13,19,20,25 45:1,2,3,15,17,19,21
United (81) 1:1,3,13 2:23,25 3:7,15 4:2,5 5:9,14 6:16 8:6,12,16,22,25 9:10,18,22,25 10:12,13 10:17 11:7 12:8 14:11 15:2,11,17,19,21 16:3 19:12,24 20:10,11,16,25 21:8,9 30:14,15,18 33:14 36:19,20 37:17 41:14,16 42:1,4,7,9 43:6 43:10 44:8 45:23,25 46:6 47:8,14,15 48:23 54:18,22,24 55:9,14,18,20,21,23 59:14 60:3 64:23,24 67:6 68:22,24 73:16
unit's (1) 12:15
unlawful (1) 47:17
unquestionably (1) 63:24
unrefuted (1) 33:8
urge (1) 60:12
use (9) 12:25 13:24 32:15 33:22 36:23 47:16 48:19 58:7 65:22
U.S (16) 3:4 4:7 8:21 9:17 10:18,19 14:10,10 17:8 18:5 19:13,23 33:5 37:5 41:11,11
U.S.C (1) 54:22

**V**

v (1) 1:5
Valerie (1) 71:6
verdict (27) 1:11 21:12,13 48:21 57:18 58:16,20 58:21 59:12,12,15 61:10,11,24 65:10 68:18,20 68:21 69:11,17 70:4,9 71:12,14,17 72:21 77:9
verdicts (1) 62:5
versus (3) 29:17 59:14 68:24
vessel (43) 3:17,18 4:13,15,22,23 5:23,6 6:20 9:5 9:8,8,11,15,25 11:12,17,20 12:13 17:19 20:19 23:24,25 24:1,11,17 25:9,14 37:21,23 38:16,22 39:1,6,10 43:7,11 44:25 45:21 46:2,4,9 65:1
vessels (1) 3:19
vessel's (1) 24:12
video (23) 4:13,19 8:19,23,24 9:1,3 10:15,24 11:16 13:14 18:10 19:25 20:7 24:5,5 33:18 34:4 38:2,5 46:7,11 48:9
videos (1) 13:17
videotape (1) 64:21
videotapes (1) 2:18
video-read (1) 75:18
Viewing (1) 65:7
violation (9) 8:6 11:8,10 12:4 54:19 55:1,10,14,18
violations (1) 54:21
visa (8) 18:5 30:14,17 41:11,11,11,13,16
visas (2) 10:17 17:9
visible (1) 20:2
visit (4) 72:2,4,4,10
visual (2) 20:2 46:3
voluntarily (3) 41:21,24 57:12
voting (1) 61:18

**W**

W (1) 1:21 77:15,21,22
wait (1) 68:2
waits (1) 4:4
waivers (1) 64:6
waiving (1) 69:20
wake (1) 6:6
walk (1) 31:9
want (26) 5:17 7:2,13,23 15:15 18:23 19:1,2,18

21:24 22:21 28:4 30:5,16 33:23 36:21 40:22 49:3,4 60:24 64:7 67:24 68:2 72:3,3,7
wanted (6) 13:5 16:9 30:14,15 44:16 46:25
wants (4) 45:9 46:13,14 72:9
wasn't (14) 3:3,3 8:22 13:7 16:1 17:21 19:14,22 26:23 29:14 37:10 38:18,19 46:1
watch (1) 38:2
watched (1) 18:10
water (7) 4:24 6:12 9:14 13:25 23:8 32:7,9
waters (5) 3:16,21,24 4:1 24:22
way (19) 6:2,12,8 19:12:3,3 16:14,15 24:5 25:9 43:8 48:15 49:15 50:1 56:22 58:1 59:6,21 72:17 74:18
waypoints (5) 25:11,12 45:3,16,18
ways (1) 7:9
week (1) 10:25
weight (3) 51:12 53:13 58:14
went (23) 3:11 9:17 12:10,11 20:15 25:14 26:14 26:15,18 27:1 29:2,3 31:6,11,23 32:3,18,18 33:19 37:16 45:22 63:20 64:24
weren't (4) 15:21 32:19 40:12 46:11
West (4) 1:7,19,23 73:2
wet (1) 31:7
we'll (10) 11:2,3 54:9 60:25 62:15 67:22 68:11 72:14 73:22 75:12
we're (3) 23:3 37:19 72:4
we've (5) 7:4 14:23 13:11 62:10 69:13
what'd (1) 29:18
where'd (2) 28:21,22
whichever (1) 74:7
white (3) 9:8 19:10 22:15
wife (1) 32:2
willful (1) 57:3
willfully (4) 56:14,16,22,23
willing (7) 6:50 14
window (1) 6:3
wish (3) 54:13 58:5 69:25
withdrawn (1) 61:7
witness (21) 5:22 18:15,17,19 29:19 51:17,19,23 51:24 52:1,3,5,6,8,10,13,15,16,19,19,22
witnesses (33) 13:14 16:5 19:5 22:18 25:23 27:4 27:10,13 29:16,17,17,19 30:25 31:1,25 32:11 33:9 34:20 36:2 37:3,3 39:14,15,16,21 40:1 44:10 50:20 51:19 53:2 63:4 64:22 74:16
women (3) 19:9 27:2,3
wood (1) 13:19
word (2) 31:3 57:10
words (5) 9:17 20:12 22:16 26:16 58:8
wore (1) 22:7
work (5) 7:10 14:11,12 33:7 74:23
works (2) 13:22 33:6
world (1) 7:9
worth (1) 28:14
wouldn't (6) 13:10 20:1,2 23:1 39:16 45:11
write (17) 15:24 16:5,8,9,10,17 18:2,6 23:1,2 29:23 40:14 41:18 60:7,24,25 61:18
written (5) 15:25 16:11 30:7 40:17 41:7
wrong (3) 13:8 59:3 66:8
wrote (3) 15:22 30:20 44:3

**X**

X (3) 59:17 77:2,11

**Y**

Yandri (12) 11:1 16:13 18:3,25 30:11,11,12,13 31:16 37:12 41:2,20
yeah (2) 31:18,23
year (1) 4:15
years (3) 6:25 60:16 72:14
yellow (1) 60:8
yesterday (5) 11:1 16:13 41:8 62:23 63:1
y'all (1) 40:23

**Z**

zinc (1) 13:19
zooming (1) 8:24

**0**

08-10017-CR-KING (2) 1:2 68:23

**1**

1 (6) 59:16,22,25 69:1 70:5 72:22
1:44 (1) 68:12
10 (3) 14:11 59:23 72:22
10th (1) 77:19
10:20 (3) 13:4 20:18,22
10:41 (1) 62:4
10:51 (1) 68:12
11 (3) 24:25 59:23 72:22
11th (2) 12:18 13:17
11:00 (1) 68:4
11:00-foot (1) 48:13
12 (8) 10:22 23:25 25:7 32:20 58:17,19 59:23 72:23
12th (9) 2:21 3:11 6:20 8:11 9:9 23:8 34:16 37:22 48:22

**12:00 (2)** 68:5,6
**13 (2)** 59:23 72:23
**1324(a)(1)(A)(iv) (1)** 54:22
**14 (5)** 2:24 3:14 35:4 59:23 72:23
**15 (4)** 25:25 34:9 59:23 72:23
**150 (1)** 1:19
**16 (3)** 25:25 59:23 72:23
**17 (2)** 59:23 72:23
**18 (9)** 21:5 23:22 36:19 46:2 48:2,23 59:23 60:5
72:23

---

| **2** |
|---|

**2 (1)** 77:4
**2:00 (2)** 63:1,7
**20 (4)** 24:2,12,15 49:2
**200 (2)** 6:25 24:16
**2007 (5)** 9:23 23:13,14,14 47:15
**2008 (13)** 2:21 3:11 6:20 8:11 23:9,25 25:1,7
34:16 37:22 42:6,8 48:22
**2009 (1)** 1:8
**2010 (1)** 77:19
**21 (1)** 77:5
**23 (1)** 1:8
**24 (4)** 25:24,24 26:24 37:7
**29 (7)** 1:10 62:22 63:18,22 64:13 65:4 77:8

---

| **3** |
|---|

**3 (4)** 59:21,22 69:3 72:22
**30 (3)** 14:4,12 27:22
**33130 (1)** 1:20
**33132 (1)** 1:17
**33401 (1)** 1:23
**34 (3)** 4:16 9:24 48:1
**36 (1)** 77:6

---

| **4** |
|---|

**4th (1)** 1:17
**40 (2)** 60:16 72:14
**404(b) (4)** 12:1 65:25 66:8 67:1
**417 (1)** 1:22
**49 (1)** 77:7

---

| **5** |
|---|

**5 (3)** 59:22 69:5 72:22
**5-E (1)** 27:25
**561)514-3768 (1)** 1:22

---

| **6** |
|---|

**6 (3)** 59:22 69:7 72:22
**60 (1)** 73:1
**62 (1)** 77:8
**68 (1)** 77:9

---

| **7** |
|---|

**7 (6)** 42:6 53:6,7 59:22 69:9 72:22
**7th (4)** 13:17 15:17 16:2 42:8
**701 (1)** 1:22
**75 (1)** 73:1

---

| **8** |
|---|

**8 (5)** 39:11 54:21,22 59:22 72:22
**8:00 (3)** 23:24 24:13,14

---

| **9** |
|---|

**9 (3)** 15:7,15 41:1
**9:00 (3)** 4:6 11:13 24:15
**99 (1)** 1:17